Harris v. Fischer

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———————————

August Term, 2015

(Argued: January 15, 2016        Decided: March 15, 2016)

Docket No. 14-2957
———————————

AUDRA LYNN HARRIS,

*Plaintiff-Appellant,*

—v.—

SGT. MICHAEL MILLER, CORRECTIONS OFFICER ELLA ANDERSON, CORRECTIONS OFFICER VALERIE BRYANT, AND CORRECTIONS OFFICER ROBIN TROTTER,

*Defendants-Appellees,*

COMMISSIONER BRIAN S. FISCHER, SUPERINTENDENT SABINA KAPLAN, ELIZABETH WILLIAMS (Former Superintendent), DONALD SAWYER (Director, Central New York Psychiatric Center (Marcy)), RICHARD ROY, DR. CATHERINE MCDERMOTT (Director, Office of Mental Health), MICHAEL CAPRA, CAPTAIN T. FITZGERALD, LARRY ZWILLINGER, JOSEPH JOSEPH, FIDELE FIORE, SGT. RORICK, CORRECTIONS OFFICER L. BELL, CORRECTIONS OFFICER HUNTER, CORRECTIONS OFFICER HARDY, CORRECTIONS OFFICER K. SLADE, CORRECTIONS OFFICER OGLESBY, CORRECTIONS OFFICER M. JORDAN, CORRECTIONS OFFICER K. DERRY, CORRECTIONS OFFICER L. SIMMONS, CORRECTIONS OFFICER K. SMITH, CORRECTIONS OFFICER C. MC NEIL, CORRECTIONS OFFICER H. MALDONADO, CORRECTIONS OFFICER SHARON GRANT,

CORRECTIONS OFFICER JOE PLOWDEN, SGT. MICHAEL DRAGOON, SUPERINTENDENT OF MEDICAL DEPARTMENT MARJORIE BYRNES, DR. LORI BETH GOLDSTEIN, NURSE PRACTITIONER ELIJAH STEVENS, LESTER WRIGHT (Commissioner of Medical), CORRECTIONS OFFICER JANE DOE #1, CORRECTIONS OFFICER JANE DOE #2, all sued and in their official capacity (the last two names being fictitious, said individuals being corrections officers of Bedford Hills Correctional Facility who participated in assaulting Plaintiff on April 8, 2010),

*Defendants.*\*

_____

B e f o r e :

KATZMANN, *Chief Judge*, KEARSE, *Circuit Judge*, and SCHOFIELD, *District Judge*.†

_____

Appeal from an order entered by the United States District Court for the Southern District of New York (McMahon, *J.*), granting summary judgment in favor of defendants. Appearing *pro se*, Plaintiff-Appellant Audra Lynn Harris, a former inmate of Bedford Hills Correctional Facility, brought several claims against the Facility's employees relating to her period of incarceration. The motions panel dismissed all but one of Harris's claims and appointed *pro bono* counsel to brief that sole remaining claim, which alleges that Defendants-Appellees Ella Anderson, Valerie Bryant, and Robin Trotter grabbed Harris, threw her to the ground, raised her smock, and forcibly spread her legs open to allow a male officer, Defendant-Appellee Michael Miller, to visually inspect Harris's genitalia for cotton. Because we conclude that the district court's

_____

\* The motions panel ordered the dismissal of the appeal against those listed only as "Defendants." The Clerk of Court is respectfully directed to amend the caption to conform to the caption above.

† The Honorable Lorna G. Schofield, of the United States District Court for the Southern District of New York, sitting by designation.

memorandum-decision and order rested on an incomplete assessment of the law, we VACATE and REMAND only so much of the order as granted summary judgment in favor of the Defendants-Appellees on this remaining claim.

_____

ARUN S. SUBRAMANIAN, Susman Godfrey L.L.P, New York, NY, *for Plaintiff-Appellant*.

DAVID LAWRENCE III, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, and Michael S. Belohlavek, Senior Counsel, *on the brief*), *for* Eric T. Schneiderman, Attorney General of the State of New York, New York, NY, *for Defendants-Appellees*.

_____

PER CURIAM:

Plaintiff-Appellant Audra Lynn Harris is a former inmate of Bedford Hills Correctional Facility. She testified at her deposition that, while incarcerated at Bedford Hills, a male officer and three female officers entered her room to take down cotton that she had removed from her mattress and pasted to her room's windows. The male officer then demanded to know if Harris had any more cotton. According to Harris's testimony, which was not disputed under oath, after she said no, the three female officers grabbed her, threw her to the ground, lifted her smock, and forcibly opened her legs to allow the male officer to visually inspect her genitalia for any additional cotton.

3

Harris later brought a claim against the officers, Defendants-Appellees

Michael Miller, Ella Anderson, Valerie Bryant, and Robin Trotter (collectively, the

"Appellees"), for violations of her constitutional rights based on this search. After

the Appellees moved for summary judgment, the United States District Court for

the Southern District of New York (McMahon, *J.*) determined that there was no

genuine dispute of material fact and that the Appellees were entitled to judgment

as a matter of law. Because we respectfully conclude that the district court's

analysis of this claim rested on an incomplete assessment of the law, particularly

the Fourth Amendment's protection of an inmate's right to bodily privacy, and

because we conclude that there are genuine disputes of material fact, we

VACATE so much of the district court's order as dismissed the claim concerning

the search for cotton, and we REMAND for further proceedings.

## I. BACKGROUND

The following facts are either uncontroverted or construed in the light most

favorable to Harris, the nonmovant. Harris was incarcerated at Bedford Hills

Correctional Facility in Bedford Hills, New York, from September 30, 2008, to

February 14, 2012, for burglary and criminal contempt. Dr. Catherine McDermott-

4

Coffin, the Forensic Unit Chief of the New York State Central New York Psychiatric Center's Satellite Unit at Bedford Hills, explained that Harris received a Level 1 designation for "Treatment Needs/Service Level" at the time of her admission. J.A. 1108–09. A Level 1 "designation is the highest level designation and is assigned to individuals displaying symptoms of major/serious mental illness, with active symptoms requiring care and treatment and/or patients who require frequent support and interventions by the mental health staff." *Id.*

During her incarceration at Bedford Hills, Harris filed at least 30 grievances against prison staff, at least 11 of them prior to the events at issue in this appeal. Harris alleges that "throughout [her] incarceration, [her] Civil Rights were violated by Bedford Hills Correction's Officers and Security staff due to their pattern of ongoing abuse of authority, fabricated Misbehavior Reports, malicious and calculated cell searches, harassment, retaliation, deliberate indifference, intentional misconduct, as well as verbal and physical abuse and beatings." J.A. 1191. She further alleges that she "was constantly harassed and retaliated against by officers because [she] wrote grievances when they violated [her] rights and the rules." J.A. 1192.

Following a series of incidents that are outside the scope of this appeal, officers transferred Harris to a one-on-one observation room to monitor her more closely. In the observation room, officers directed Harris to change into a smock. Harris, who had been in an observation room before, acknowledged that changing into a smock was standard procedure. At her deposition, Harris explained that she attempted to put the smock on over her clothing while getting undressed, but the officers told her she could not undress in that manner. She stated that the officers proceeded to knock her down and pull off her clothing, injuring her in the process, before throwing the smock at her. (It is unclear from the record which officers were involved in this incident.) Harris contends that she then requested medical assistance from nearby nurses, but the officers who had changed her clothing refused to allow the nurses to tend to her.

At that point, Harris attempted to use her mattress to block the observation room's windows. She explained at her deposition: "I put up my mattress again so I couldn't be seen, because I felt humiliated. I felt like I had been raped, and nobody would help me." J.A. 1072. Harris then ripped open her mattress, which

6

may have been torn already, and started using water to put the mattress's cotton stuffing on the windows so that she "couldn't be seen." J.A. 1072.

What occurred after Harris began pasting the cotton to the windows is the focus of this appeal. At her deposition, Harris testified that a male officer, Miller, and three female officers—later identified as Anderson, Bryant, and Trotter—entered her room and started taking down the cotton while Harris stood in the shower. At her deposition, Harris recounted the events that followed:

> And [Miller], said you have any more cotton? And I said no. He told me to lift up my smock. And I said, I don't have anything. I said, you can't do that. You are a man. And then he nodded to the three officers, and they snatched me on the ground, threw me on the ground, and they started—like I tried to keep my legs closed, and they pulled my legs apart, lift up my smock. And they opened my legs and he at my legs—between my legs. And then they threw my legs down, and then I started screaming. I started screaming. I realized I had a cut.

J.A. 1072. Shortly after this incident, Miller, with the assistance of others, caused Harris to be injected with antipsychotic medication.

Several weeks later, Harris filed a grievance complaining about the April 8, 2010 search. The description she provided in that grievance is consistent with her initial complaint filed in the district court on September 7, 2011, her amended complaint filed on November 29, 2011, her deposition testimony on November 26,

2012, and, finally, her declaration in opposition to defendants' motion for summary judgment filed on November 22, 2013.

Harris's description is also the only evidence in the record detailing the April 8, 2010 search: The Appellees did not offer any evidence contradicting Harris's description of the incident, such as an affidavit from Miller stating that the search never happened or explaining that it did not happen as Harris describes. Instead, the Appellees' only denial that the search occurred was in their briefs filed in the district court. Moreover, the evidence that the Appellees submitted to the district court relating to the incident corroborates much of Harris's description, although it is silent on the officers' conduct. For example, the Appellees submitted an Inmate Misbehavior Report dated April 8, 2010, which states that, on April 8, 2010,

> while conducting an 1 on 1 watch with inmate Harris . . . , after discovering she was moving her mattress to the shower, [Anderson] gave her several direct orders to move it. Inmate Harris proceeded to rip a hole in the mattress & place it's contents on the floor and the glass (she used water as a paste) blocking [Anderson's] view.

J.A. 1131. They also submitted the following entry from Harris's medical file, also dated April 8, 2010:

Inmate has been on Infirmary for several days, but today, became combative & irrational, prompting a phone call to OMH – Inmate's therapist, Spatarella, attended pt. on the infirmary & requested 1:1 observation in the Infirmary. Upon nurse's attempted assessment, inmate verbally abusive, demanding some cream for her arm; but had been pulling apart her mattress, trying to flood her cell, laying in the shower & refusing to come out. At one point, pt. very angry, blocking her window with her robe, and plastering her window with wet paper towels, blocking CO's view. Inmate refused [illegible] ordered stat by MD, and received [illegible] Zyprexa.

J.A. 1097.

## II. PROCEDURAL HISTORY

On September 7, 2011, appearing *pro se*, Harris filed suit in the U.S. District Court for the Southern District of New York. As with many *pro se* litigants, Harris's pleadings are less than clear, naming a plethora of individuals and asserting at least eight claims. On September 16, 2013, following the close of discovery, the defendants moved for summary judgment. On August 1, 2014, the district court granted that motion in its entirety. *See Harris v. Fischer*, No. 11 Civ. 6260 (CM)(JLC), 2014 U.S. Dist. LEXIS 107503, at *83, 2014 WL 3859242, at *30 (S.D.N.Y. Aug. 1, 2014). Harris timely filed a notice of appeal on August 15, 2014.

On December 2, 2014, a motions panel of this Court appointed *pro bono* counsel for Harris and directed counsel to brief whether the April 8, 2010 search

performed by the Appellees violated Harris's constitutional rights. The motions panel dismissed all of Harris's remaining claims as to all other defendants as lacking an arguable basis in law and fact. Accordingly, the only claim we address in this opinion is Harris's remaining claim that the April 8, 2010 search performed by the Appellees violated her constitutional rights.

## III.    DISCUSSION

Harris argues that the search violated both her Fourth Amendment right to be free from unreasonable searches and her Eighth Amendment right to be free from cruel and unusual punishment. The district court correctly recognized that courts "should 'liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest." *Harris*, 2014 U.S. Dist. LEXIS 107503, at *13, 2014 WL 3859242, at *5 (quoting *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007)). In analyzing Harris's allegations, however, the district court appears to have construed them as raising only an Eighth Amendment claim, even though the district court drew on case law from both the Fourth and Eighth Amendment contexts in its analysis. *See Harris*, 2014 U.S. Dist. LEXIS 107503, at *30–35, 2014 WL 3859242, at *11–13.

Whether the district court assumed that the Fourth Amendment did not protect an inmate's right to bodily privacy is unclear. Because we respectfully believe that the district court's analysis rested on an incomplete assessment of the law, we take this opportunity to state the legal principles that should guide the district court on remand.

## A. Standard of Review

"We review a district court's decision to grant summary judgment *de novo*, construing the evidence in the light most favorable to the party against which summary judgment was granted and drawing all reasonable inferences in its favor." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 815 (2d Cir. 2014) (quoting *Wachovia Bank, N.A. v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011)). "We will affirm a grant of summary judgment only if there is no genuine issue of material fact and the prevailing party was entitled to judgment as a matter of law." *Id.* But "[a] motion for summary judgment must be rejected 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 465 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

11

And "[i]t is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).[1]

## B. The Fourth Amendment

While acknowledging that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer*, 468 U.S. 517, 526 (1984), we held more than twenty years ago "that maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy," *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992). We are aware of no intervening Supreme Court decision calling that holding into doubt, and we reiterate today that inmates retain a limited right to bodily privacy under the Fourth Amendment.

---

[1] The district court deemed Harris's claim relating to the April 8, 2010 search exhausted, as required by 42 U.S.C. § 1997e(a), because "Defendants [did] not argue that Plaintiff failed to exhaust this claim." *Harris*, 2014 U.S. Dist. LEXIS 107503, at *30, 2014 WL 3859242, at *11. Appellees do not contest this conclusion on appeal, and so we deem the claim exhausted or the argument waived. *See Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 445 (2d Cir. 2006).

The prison context does affect, however, the way that courts must analyze alleged violations of this Fourth Amendment right. Courts assessing an inmate's claim that officers infringed his or her right to bodily privacy must undertake a two-part inquiry: (1) First, the court must determine whether the inmate has "exhibit[ed] an actual, subjective expectation of bodily privacy"; and (2) second, the court must determine "whether the prison officials had sufficient justification to intrude on [the inmate's] fourth amendment rights." *Id.* at 77–78.

In considering the second question, courts apply one of two separate but overlapping frameworks. If the inmate's Fourth Amendment claim challenges a prison regulation or policy, courts typically analyze the claim under *Turner v. Safley*, 482 U.S. 78 (1987). Under *Turner*, "the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. Courts make this determination with reference to four factors discussed in *Turner*. *See Covino*, 967 F.2d at 78–79 (discussing the *Turner* factors).

But if the inmate's Fourth Amendment claim challenges an isolated search, courts typically apply the standard set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979).[2] *See, e.g., Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1141 n.6 (9th Cir. 2011) (en banc) ("Because Byrd did not challenge the constitutionality of the Contraband Policy, and because the district court focused on the facts of the actual search conducted rather than on the provisions of the Contraband Policy, we apply the *Bell* factors rather than those articulated in [*Turner*], which addresses inmate challenges to regulations."). As the *Bell* Court observed, "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." 441 U.S. at 559. Instead,

> [i]n each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider [1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted.

---

[2] *Bell* arose in the context of a pretrial detainee strip-search policy, but its framework is equally applicable to convicted inmates challenging isolated searches. *Cf. Covino*, 967 F.2d at 78 n.4; *Cookish v. Powell*, 945 F.2d 441, 445–46 (1st Cir. 1991).

14

*Id.* Because Harris challenges an isolated search rather than a policy (indeed, neither party identifies what the relevant policy is at Bedford Hills), *Bell*'s four-factor test governs the present analysis.

### 1. The Scope of the Intrusion

We begin by noting that the first *Bell* factor—the scope of the intrusion—varies with the type of search. There are at least three types of searches that implicate an inmate's right to bodily privacy:

> A "strip search," though an umbrella term[,] generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

*Cookish*, 945 F.2d at 444 n.5 (quoting *Blackburn v. Snow*, 771 F.2d 556, 561 n.3 (1st Cir. 1985)). The scope of the intrusion also varies depending on who searches whom, i.e., whether the search involved an officer of the same gender as the inmate. Each of these factors—the type of search and the person conducting the search—is independently relevant to *Bell*'s reasonableness inquiry.

15

### a. The Type of Search

Regardless of who performs the search, a visual body cavity search, such as the one conducted here, is invasive: "A strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy." *Florence v. Bd. of Chosen Freeholders*, 566 U.S. --, 132 S. Ct. 1510, 1526 (2012) (Breyer, J., dissenting); *see also Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) ("[O]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy." (quoting 3 George B. Trubow, ed., *Privacy Law and Practice*, ¶ 25.02[1] (1991))); *Cookish*, 945 F.2d at 446 ("[A] 'severe if not gross interference with a person's privacy [] occurs when guards conduct a visual inspection of body cavities." (quoting *Arruda v. Fair*, 710 F.2d 886, 887 (1st Cir. 1983))).

### b. Who Performs the Search

"[W]hile all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's

naked body viewed by a member of the opposite sex." *Canedy*, 16 F.3d at 185; *see*

*also Byrd*, 629 F.3d at 1141 ("We approach this issue by reiterating our

longstanding recognition that '[t]he desire to shield one's unclothed figure from

[the] view of strangers, and particularly strangers of the opposite sex, is impelled

by elementary self-respect and personal dignity.'" (quoting *York v. Story*, 324 F.2d

450, 455 (9th Cir. 1963))). For this reason, "[c]ourts throughout the country have

universally frowned upon cross-gender strip searches in the absence of an

emergency or exigent circumstances." *Byrd*, 629 F.3d at 1143; *see also Lee v. Downs*,

641 F.2d 1117, 1119 (4th Cir. 1981) ("Most people, however, have a special sense of

privacy in their genitals, and involuntary exposure of them in the presence of

people of the other sex may be especially demeaning and humiliating. When not

reasonably necessary, that sort of degradation is not to be visited upon those

confined in our prisons."); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993)

(citing *Lee* and "join[ing] other circuits in recognizing a prisoner's constitutional

right to bodily privacy").

Indeed, best-practice standards in prison management typically discourage

cross-gender strip searches. For example, the 2009 National Prison Rape

Elimination Commission Report ("Commission Report")[3] "determined that[,] '[t]o prevent abuse, . . . the [Commission's recommended] standard on this subject strictly prohibits non-medical staff from conducting cross-gender strip and visual body cavity searches—except in the case of an emergency—because of their extraordinarily intrusive nature.'" *Byrd*, 629 F.3d at 1142 (quoting the Commission Report at 63). Likewise, the American Correctional Association's recommended standard for cross-gender strip searches "provide[s] that, except in emergency situations, visual inspections of inmate body cavities are conducted by officers of the same sex, in private." *Id.* (quoting Standards for Adult Correctional Institutions § 4-4194 (2003)).

Here, a male officer visually inspected Harris's genitalia, and both the type of search (a visual body cavity search) and the person performing the search (a

---

[3] Congress established the National Prison Rape Elimination Commission as part of the 2003 Prison Rape Elimination Act, Pub. L. No. 108-79, 117 Stat. 972 (codified at 42 U.S.C. §§ 15601–15609). Congress directed the Commission to prepare a "[c]omprehensive study of the impacts of prison rape," § 15606(d), and to prepare a report on the study containing "(i) the findings and conclusions of the Commission; (ii) recommended national standards for reducing prison rape; (iii) recommended protocols for preserving evidence and treating victims of prison rape; and (iv) a summary of the materials relied on by the Commission in the preparation of the report," § 15606(d)(3)(B).

man) are independently relevant to considering the scope of that intrusion under

*Bell*.

### 2. The Manner in Which the Search Was Conducted

A strip search conducted in a professional manner is more reasonable than one that is not. *Cf. Grummett v. Rushen*, 779 F.2d 491, 496 (9th Cir. 1985) (emphasizing that "[t]he record indicates that the searches are performed by the female guards in a professional manner and with respect for the inmates"). *But see Byrd*, 629 F.3d at 1143 ("[W]e have consistently recognized the 'frightening and humiliating invasion' occasioned by a strip search, 'even when conducted with all due courtesy.'" (quoting *Way v. Cty. of Ventura*, 445 F.3d 1157, 1160 (9th Cir. 2006))).

As the Supreme Court stated in *Bell*: "[O]n occasion a security guard may conduct the search in an abusive fashion. Such abuse cannot be condoned. The searches must be conducted in a reasonable manner." *Bell*, 441 U.S. at 560 (citations omitted). Here, it is unclear from the record, viewed in the light most favorable to Harris, why the visual body cavity search was conducted in such a violent and forceful manner, much less why it was conducted by a man when

19

female officers were readily available to do the search. *See, e.g.*, *Lee*, 641 F.2d at 1120 ("[I]t was wholly unnecessary for the male guards to remain in the room and to restrain the plaintiff while her underclothing was forcefully removed.").

### 3. The Justification for Initiating the Search

It is difficult to assess the Appellees' justification for the search here because they provided no evidence controverting Harris's description of events; instead, they provided in their briefs a blanket denial that the search ever occurred and, in the alternative, a vague justification, assuming the search occurred as Harris describes. For courts to be able to assess the reasonableness of an intrusion on an inmate's constitutional rights, Supreme Court precedent suggests that officers must provide a justification that is supported by record evidence. *Cf. Florence*, 132 S. Ct. at 1518 ("[D]eference must be given to the officials in charge of the jail unless there is substantial evidence demonstrating their response to the situation is exaggerated. Petitioner has not met this standard, and the record provides full justifications for the procedures used." (citation and quotation marks omitted)); *Turner*, 482 U.S. at 98 ("[W]ith respect to the security concern emphasized in petitioners' brief—the creation of 'love triangles'—

20

petitioners have pointed to nothing in the record suggesting that the marriage

regulation was viewed as preventing such entanglements.").

Circuit courts have similarly required a justification for inmate searches

that is supported by record evidence. *See, e.g.*, *Byrd*, 629 F.3d at 1137 n.2 (noting

that officer's trial testimony "d[id] not specifically address the availability of the

male officers to conduct the search[]" of the male plaintiff); *id.* at 1143

("[A]lthough valid reasons to search the inmates existed generally, there was no

justification given for conducting a cross-gender strip search."); *id.* at 1142

(reversing district court's decision that the cross-gender strip search did not

violate the plaintiff's Fourth Amendment rights, and ruling "that the cross-gender

strip search of Byrd was unreasonable as a matter of law"); *Hayes v. Marriott*, 70

F.3d 1144, 1148 (10th Cir. 1995) (vacating summary judgment that was based on

unsworn statements by prison officials as to the circumstances of the challenged

search); *Bono v. Saxbe*, 620 F.2d 609, 617 (7th Cir. 1980) ("[*Bell*] should not be

extended to the facts of this case without a showing that there is some risk that

contraband will be smuggled into Marion [Penitentiary] during non-contact,

supervised visits, or that some other risk within the prison will be presented.").

Requiring record evidence to support an officer's justification for a visual body cavity search is sensible: We would, for example, almost certainly find a constitutional violation for a search that objectively appears to have been conducted solely to gratify the sexual desires of the officer. *Cf. Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) (recognizing under the Eighth Amendment that a "search may not be undertaken maliciously or for the purposes of sexually abusing an inmate"). Without record evidence supporting the officer's justification, courts will have difficulty assessing whether the officer had an objectively reasonable basis for conducting the search.

The circumstances here demonstrate the point. Because the defendants supplied only a vague justification for the search in their motion papers and did not provide evidence supporting *any* justification, the district court resorted to supplying its own hypothetical justification:

> Plaintiff was creating a security risk by tearing apart her mattress and trying to use its contents to shield herself from the view of corrections officers who had a legitimate right to observe her. Ascertaining that Plaintiff did not have the means to obstruct their view is a legitimate penological goal, which fully justifies the brief visual inspection of Plaintiff's genitalia.

22

*Harris*, 2014 U.S. Dist. LEXIS 107503, at \*34, 2014 WL 3859242, at \*12. On appeal, Appellees concede that additional facts (which were not before the district court) render this justification questionable "because it would have been difficult for Harris to conceal enough cotton to effectively obstruct the entirety of the windows, which reach from the floor to the ceiling, and span the width of both the front and back sides of the cell." Appellees' Br. 14 n.3. Had the district court known these facts, we believe it likely would have concluded that the search of Harris's genitalia for cotton was an exaggerated, *see Florence*, 132 S. Ct. at 1517, or even unnecessary, *see Hodges v. Stanley*, 712 F.2d 34, 35 (2d Cir. 1983), response to the situation.

Appellees advance an alternative theory that "the alleged visual body-cavity search would have been justified by the legitimate penological interest of ensuring that a potentially suicidal inmate not possess any object by which she might harm herself or others." Appellees' Br. at 10. Appellees have not cited any record evidence, however, that Harris, who was restrained by three female officers at the time of the search, was in such imminent danger of harming herself that the search had to be conducted immediately by the male officer at the scene.

At oral argument, defense counsel also candidly admitted that there is no record evidence indicating that the officers ever searched Harris's mouth—the most logical place to search if the officers were concerned that Harris would attempt to use cotton to choke herself to death. Given the current state of the record, a factfinder could find Appellees' proffered justification unconvincing.

As these inconsistent theories demonstrate, it is difficult, if not impossible, for courts to determine the reasonableness of a visual body cavity search without record evidence supporting the officer's justification for initiating the search. *Cf. Byrd*, 629 F.3d at 1149 (Smith, J., concurring in part, dissenting in part) ("It is appropriate to begin the analysis by looking at the justification for initiating the search, because, in the absence of a proper justification, even the most unintrusive search is unreasonable.").[4] And, as the above discussion indicates, there are at least disputes of fact concerning whether the search occurred and the Appellees' justification that should have precluded summary judgment in their favor.

---

[4] "Whether a particular strip search is constitutional 'turns on an objective assessment of the . . . facts and circumstances confronting [the searching officer] at the time, and not on the officer's actual state of mind at the time' of the search." *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (quoting *Maryland v. Macon*, 472 U.S. 463, 470–71 (1985)). But there must be evidence from which an objective assessment can be made of the facts and circumstances confronting the officer.

Before turning to the final *Bell* factor, we briefly address the Appellees' argument that prison officers are privileged to search inmates for contraband. Whether an officer is searching for contraband is highly relevant to the reasonableness inquiry. *See, e.g.*, *Lee*, 641 F.2d at 1120 (finding female nurse's manual body cavity search of female inmate for matches while male officers restrained the inmate reasonable because "plaintiff had set her paper dress afire" and "there was a reasonable necessity for a search of sufficient thoroughness to give assurance that she had no more matches"). But we are deeply skeptical that the cotton sought here was in fact contraband, i.e., an "unauthorized item." *See Florence*, 132 S. Ct. at 1519 (citing Prisons: Today and Tomorrow 237 (J. Pollock ed. 1997) ("*Contraband* is any item that is possessed in violation of prison rules. Contraband obviously includes drugs or weapons, but it can also be money, cigarettes, or even some types of clothing.")). The Appellees point to nothing that would suggest that possessing cotton, in one's genitalia or elsewhere, violates prison rules, and we do not endorse the Appellees' implicit argument that an item becomes contraband merely because officers are looking for it.

### 4. The Place in Which the Search Was Conducted

Courts have arrived at different conclusions as to what makes the place in which the search was conducted more or less reasonable. Some courts have found that searches conducted in the presence of other inmates are more reasonable because there is less chance for abuse. *See, e.g., Byrd*, 629 F.3d at 1143 ("Byrd was searched in the day room, a common area. Other inmates were present, making it less likely that improper conduct would occur.").[5] Other courts have found that searches conducted outside the presence of other inmates are more reasonable. *See, e.g., Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988) (finding merit to inmate's argument that "strip searches should be conducted within the privacy of prisoners' cells rather than out in the hallway"). Because the Fourth Amendment interest at issue here concerns an inmate's right to bodily privacy, we find the latter approach more sensible; i.e., a strip search or a body cavity search conducted in the presence of unnecessary spectators is less reasonable than one conducted in the presence of only those individuals needed to conduct the search.

---

[5] Although the Ninth Circuit concluded in *Byrd* that the third and fourth *Bell* factors "weigh[ed] in favor of a determination of reasonableness, the effect of the first two factors [wa]s so extreme that a conclusion of unreasonableness [wa]s compelled." 629 F.3d at 1143.

### 5. Fourth Amendment Conclusion

We reiterate that inmates retain a limited right of bodily privacy under the Fourth Amendment. If an inmate exhibits an actual, subjective expectation of bodily privacy, and if the inmate challenges an isolated search as infringing on his or her right of bodily privacy, courts should assess the claimed violation for reasonableness under the four *Bell* factors: (1) the scope of the intrusion; (2) the manner in which it was conducted; (3) the justification for initiating it; and (4) the place in which it was conducted. We further note that cross-gender strip searches of inmates conducted in the absence of an emergency or other exigent circumstances are generally frowned upon. *See, e.g.*, *Moore v. Carwell*, 168 F.3d 234, 237 (5th Cir. 1999); *Hayes*, 70 F.3d at 1146; *Canedy*, 16 F.3d at 187; *Lee*, 641 F.2d at 1119. We remand to the district court to reconsider Harris's Fourth Amendment claim in light of the legal principles discussed above.

### C. Qualified Immunity

On appeal, Appellees advance a qualified immunity defense to Harris's Fourth Amendment claim. Qualified immunity is an affirmative defense that may be waived if, as here, the defendants failed to move for summary judgment on

this defense, even if, also as here, the defendants asserted the defense in their answer. *See, e.g.*, *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997); *see also Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir. 1995).

"[W]e nevertheless have the power to consider" the defense. *Fabrikant v. French*, 691 F.3d 193, 212 (2d Cir. 2012). "We have exercised this discretion where the argument presents a question of law and there is no need for additional fact-finding." *Id.* (quoting *Dean v. Blumenthal*, 577 F.3d 60, 67 n.6 (2d Cir. 2009) (per curiam)). But because of the factual disputes concerning whether the search occurred and the officers' justification for the search, we leave it to the district court to evaluate this defense in the first instance. *Cf. Ford v. McGinnis*, 352 F.3d 582, 598 (2d Cir. 2003).

## D. Eighth Amendment

Harris also asserts that the April 8, 2010 search violated her Eighth Amendment right to be free from cruel and unusual punishment. "To state an Eighth Amendment claim, a prisoner must allege two elements, one subjective and one objective." *Crawford*, 796 F.3d at 256.

28

## 1. The Subjective Inquiry

"First, the prisoner must allege that the defendant acted with a subjectively 'sufficiently culpable state of mind.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (hereinafter "*McMillian*")). "The subjective component of the claim requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by "wantonness"' in light of the particular circumstances surrounding the challenged conduct." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). For excessive force claims, as contrasted with other actions or inactions that rise to the level of Eighth Amendment violations, the test for wantonness "is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

> To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as "the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response."

*Id.* (quoting *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993)).

29

Accordingly, determining whether officers used *excessive* force necessarily turns on the need for the force used. Here, Harris contends that Miller asked if she had any more cotton and, when she said no, Anderson, Bryant, and Trotter threw her to the ground and forcibly opened her legs to allow Miller to conduct a visual search of her genitalia for additional cotton. The district court concluded that the Appellees' use of force was justified based on the need to determine if she was concealing cotton that could be used to obstruct the windows of her observation room. *See Harris*, 2014 U.S. Dist. LEXIS 107503, at * 34, 2014 WL 3859242, at *12. As noted, the Appellees have distanced themselves from this purported justification for the search.

We note that the factual dispute concerning the Appellees' need for the use of force greatly affects the Eighth Amendment analysis. For example, the need for the application of force to carry out a visual body cavity search may be weak if the search itself was unreasonable. Likewise, the relationship between that need and the amount of force used may be disproportionate to any legitimate penological goal if, once again, the search was unreasonable. The factual dispute regarding the Appellees' need for the use of force also makes it difficult, if not

impossible, to ascertain what threat the officers perceived and whether they made

an effort to temper the severity of their response. As the Seventh Circuit

explained in a similar setting:

> [S]ubjective intent . . . , unless admitted, has to be inferred rather than observed; judges and jurors are not mind readers. The plaintiff alleges that he complained vociferously to the defendant about the pat down and strip search while they were going on, to no avail. We don't see how the defendant's conduct if correctly described by the plaintiff could be thought a proper incident of a pat down or search, and the defendant doesn't contend that it could be; his defense rather is that his conduct has been misdescribed.

*Washington v. Hively*, 695 F.3d 641, 643–44 (7th Cir. 2012) (hereinafter "*Hively*").

Because Appellees deny that the search ever occurred, and because of the shifting

explanations and limited support for the Appellees' need for the use of force,

assuming the search occurred, there exists a genuine dispute of material fact

concerning the subjective component of Harris's Eighth Amendment claim.

## 2. Objective Inquiry

"Second, [the inmate] must allege that the conduct was objectively 'harmful

enough' or 'sufficiently serious' to reach constitutional dimensions." *Crawford*, 796

F.3d at 256 (quoting *McMillian*, 503 U.S. at 8, 20). "The objective component of the

Eighth Amendment test is also context specific, turning upon 'contemporary

standards of decency.'" *Blyden*, 186 F.3d at 263 (quoting *McMillian*, 503 U.S. at 8).

But "certain actions, including the malicious use of force to cause harm, constitute

Eighth Amendment violations *per se*. This result follows because when prison

officials maliciously and sadistically use force to cause harm, contemporary

standards of decency are always violated." *Id.* (citation and quotation marks

omitted). Finally, *McMillian* "firmly establishes that this factor is satisfied in the

excessive force context even if the victim does not suffer serious, or significant

injury, as long as the amount of force used is not *de minimis*." *United States v.*

*Walsh*, 194 F.3d 37, 50 (2d Cir. 1999) (citations and quotation marks omitted); *see*

*also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) ("The 'core judicial

inquiry,' we held, was not whether a certain quantum of injury was sustained, but

rather 'whether force was applied in a good-faith effort to maintain or restore

discipline, or maliciously and sadistically to cause harm.'" (quoting *McMillian*,

503 U.S. at 7)).

We cannot discern from the district court's analysis whether it adequately

considered the possibility that the search alleged to have occurred here—in which

female officers grabbed Harris, threw her to the ground, and forcefully spread her

legs open to allow a male officer to visually inspect her genitalia for *cotton*—

offends contemporary standards of decency. Appellees counter that Harris cannot

rely on the inspection of her genitalia as informing the Eighth Amendment

analysis because it was "visual in nature and Harris claims no contact by

defendants with her genitals." Appellees' Br. 27. We do not see why the lack of

contact with Harris's genitalia would bar her Eighth Amendment claim as a

matter of law. *Cf. Hively*, 695 F.3d at 643 ("Indeed, sexual offenses need not

involve *any* touching—think of indecent exposure, voyeurism, and child

pornography that does not depict sex acts.").

Moreover, the district court appears to have focused on Harris's refusal to

allow a male officer to inspect her genitalia rather than the amount of force the

officers used in carrying out that search. *See Harris*, 2014 U.S. Dist. LEXIS 107503,

at *33, 2014 WL 3859242, at *12 ("[T]here is no evidence that the use of force was

anything but *de minimis* given Plaintiff's refusal to cooperate with the direct

orders of prison officers."). The Supreme Court recently reminded us that the *de

minimis* exception covers, for example, "[a]n inmate who complains of a 'push or

shove' that causes no discernible injury." *Wilkins*, 559 U.S. at 38 (quoting

33

*McMillian*, 503 U.S. at 9). But Harris does not describe a mere push or shove; she describes officers grabbing her, throwing her to the ground, and forcibly opening her legs. Harris also pointed to documentary evidence showing that she suffered bruising, and possibly a three-inch cut, as a result of the officers' use of force. Such injuries may suggest that the use of force here was objectively excessive. *See, e.g., id.* at 37 ("[T]he extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation. The extent of injury may also provide some indication of the amount of force applied." (citations and quotation marks omitted)).

### 3. Eighth Amendment Conclusion

We readily admit that the evidence in this case is difficult to parse. But where, as here,

> a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically, our Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak.

34

*Wright*, 554 F.3d at 269 (citing *Scott*, 344 F.3d at 291; *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999)). Accordingly, we remand to the district court to reconsider Harris's Eighth Amendment claim in light of the legal principles discussed above.

## CONCLUSION

For the reasons stated herein, we VACATE so much of the district court's order and judgment as dismissed Harris's constitutional claims relating to the visual body cavity search performed by Appellees on April 8, 2010, and we REMAND for further proceedings consistent with this opinion. For the sake of completeness, we note that, per the motions panel's prior order, Harris's other claims as to all other defendants remain dismissed. Finally, we suggest that, on remand, the district court consider appointing *pro bono* counsel for Harris and permitting the parties to take further discovery. *See, e.g.*, *Willey v. Kirkpatrick*, 801 F.3d 51, 71–72 (2d Cir. 2015).