*Kenlock v. Dubois*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 11th day of December, two thousand twenty-three.

PRESENT:
> GERARD E. LYNCH,
> MICHAEL H. PARK,
> STEVEN J. MENASHI,
> *Circuit Judges*.

_____

Orville Kenlock,

> *Plaintiff-Appellant*,

> v.                                                      **22-2799**

Colonel Anthony M. Mele, Orange County, New York Correctional Facility (Jail) Colonel, in his individual capacity, Officer Bloise, Orange County, New York Correctional Facility Officer, Shield #360, in his individual capacity, Officers "John Does," Orange County, New York Correctional Facility (Jail) Line and Command Officers, in their individual capacities, Sergeant K. Kiszka, Orange County, New York Correctional Facility (Jail) Sergeant, Shield #134, in his individual capacity,

> *Defendants-Appellees.*[*]

_____

[*] The Clerk of Court is respectfully directed to amend the caption accordingly.

**FOR PLAINTIFF-APPELLANT:** JAMES I. MEYERSON, New York, NY (Michael Ranis, Goshen, NY, *on the briefs*).

**FOR DEFENDANTS-APPELLEES:** KELLIE E. LAGITCH, Chief Assistant County Attorney, *for* Richard B. Golden, Orange County Attorney, Goshen, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Román, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Orville Kenlock sued Orange County, New York and its employees, alleging various forms of mistreatment while he was detained at Orange County Correctional Facility ("OCCF") in 2018 and 2019. Kenlock alleged that in June 2018, Defendant-Appellee Officer Bloise ordered him to remove toilet paper that was partially obscuring his cell window during a routine head count. Kenlock was naked—he informed Bloise as much—but Bloise insisted on the removal of the window covering, and Kenlock's naked body was exposed to the officer's view. Bloise's order was contrary to what Kenlock alleges was an informal but generally accepted practice of guards to permit detainees to obscure the lower portion of their cell windows when they were using the toilet or otherwise indisposed.

Kenlock filed a grievance. Then, he alleges, Bloise repeatedly harassed him: stopping by his cell unbidden to call him names, hassling him on the way to substance abuse treatment, and refusing to open his cell for a couple of hours without justification. Kenlock filed a second grievance after Bloise stopped by his cell to call him names. In another incident that Kenlock emphasizes, Bloise brought Kenlock a razor when Kenlock wanted to shave. When Bloise

approached Kenlock's cell, Bloise called him "sexy chocolate" and told him that he could have the razor without following the jail's standard rules for borrowing razors. Kenlock characterizes that encounter as a continuation of Bloise's sexual harassment and an attempt to frame Kenlock by inducing him to break the jail's rules.

In addition to filing grievances, Kenlock sought mental health services following the head-count incident. He ultimately submitted at least twelve requests for mental health services, meeting with his assigned counselor on several occasions. But he was eventually informed that he should stop submitting requests and "wasting" the jail's mental health services. Joint App'x at 59.

Kenlock brought claims under 42 U.S.C. § 1983 alleging violations of his rights under the First, Fourth, and Fourteenth Amendments stemming from his interactions with Bloise and the administrators' decision to deny him access to mental health services.[2] The district court dismissed each of his causes of action for failure to state a claim. He now appeals as to a subset of those claims. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

We review de novo a district court's grant of a motion to dismiss under Rule 12(b)(6). *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019). We may affirm on any ground that finds support in the record. *Dettelis v. Sharbaugh*, 919 F.3d 161, 163 (2d Cir. 2019).

---

[2] Kenlock's Second Amended Complaint asserted claims under the Fourth and Fourteenth Amendments only. However, the district court properly analyzed Kenlock's retaliation claims under the First Amendment.

3

## I.    Fourth Amendment

A Fourth Amendment claim for the infringement of the right to bodily privacy requires an actual, subjective expectation of bodily privacy on which officials lacked a sufficient justification to intrude.    *See Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016).

Whether there exists "sufficient justification" depends on whether a prisoner challenges a prison policy or merely a particular search.    Policies will be upheld if they are reasonably related to a legitimate penological interest.    *See id.* at 57-58 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012) (application to pretrial detainees).    But courts analyze challenges to isolated searches using the standards articulated in *Bell v. Wolfish*, 441 U.S. 520 (1979).    *Harris*, 818 F.3d at 57.    Under those standards, reasonableness remains the touchstone of the court's analysis, but it must specifically consider: (1) the scope of the particular intrusion; (2) the manner in which it is conducted; (3) the justification for initiating it; and (4) the place in which it is conducted.    *See Bell*, 441 U.S. at 559.

Here, the district court concluded that Bloise's viewing of Kenlock's naked body during a head count was a justified infringement on Kenlock's limited right to privacy in his cell and that any intrusion on his privacy was minimal.    There is adequate support in the record for us to agree that, under the *Bell* factors, Bloise had sufficient justification for the limited infringement on Kenlock's privacy.

The first and last factors plainly favor Appellees: the scope of the intrusion (a brief viewing of Kenlock's naked body, from a distance, through a cell door) and the relatively private place in which it occurred.    *Harris*, 818 F.3d at 58, 62.

4

As to the second factor, the "justification for the search," Kenlock alleges that Bloise had no justification for ordering him to remove the toilet paper from his window. According to Kenlock, the purpose of a head count is to ensure that detainees are physically in their cells, and Bloise could see that Kenlock was present even with toilet paper covering the lower portion of the cell window. Kenlock also contends that it was an "institution[] wide" practice to permit detainees to cover the lower portion of their windows and that Kenlock had not had any issues about this practice with other officers.

But Kenlock does not sufficiently allege that allowing detainees to cover their windows was an institutional jail policy, rather than an informal practice that some guards chose to follow. Indeed, his complaint recognizes that guards did, at least sometimes, need an unobstructed view through a detainee's cell window during head counts. *See* Joint App'x at 46-47 (referring to an "alternative practice" by which guards would "continue the count of the other unit cells and return" later to give a detainee time to cover themselves and remove the toilet paper covering the lower portion of their cell window). Although Kenlock alleges that Bloise had "no objectively based non pretextual legitimate security and/or safety justification" for the search, *id.* at 49, we need not credit such conclusory allegations. To the extent he claims that there would have been no constitutional violation if Bloise had skipped over his cell and returned later, he necessarily recognizes that there exist legitimate reasons for guards to look into cells during a count. We thus conclude that the "justification for the search" factor does not favor Kenlock either.

Even assuming that the remaining *Bell* factor—the manner in which the search was conducted—favors Kenlock, he does not plausibly allege facts on which a jury could conclude that

5

the factors taken together establish a Fourth Amendment violation. We thus affirm the district court's dismissal of Kenlock's Fourth Amendment claim.

**II.     Equal Protection**

The district court dismissed Kenlock's equal protection claims because the complaint failed to allege "that Bloise treated him differently than others similarly situated." Joint App'x at 124. Kenlock fails to challenge the district court's holding that he was obligated to identify comparators of similarly situated individuals, *see Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir. 1997) ("We consider abandoned any claims not adequately presented in an appellant's brief."), but his argument would fail even if he had done so.

Kenlock, relying primarily on cases from the employment context, argues that sexual harassment violates the Equal Protection Clause. But even assuming that the cases on which Kenlock relies apply in a prison or jail context, the standards articulated in those cases require the plaintiff to show severe or pervasive sexual harassment to make out an equal protection claim. *See, e.g.*, *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000). Isolated incidents of harassment will not suffice unless they are "extraordinarily severe." *Id.* (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)). As explained above, Kenlock has not adequately alleged that Bloise's conduct was sufficiently severe or pervasive to make out a constitutional claim.

**III.     Retaliation**

We review Kenlock's retaliation claims "with skepticism and particular care" because "virtually any adverse action" taken against him by a jail official—"even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed

6

retaliatory act." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001)). A "plaintiff asserting First Amendment retaliation claims must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Id.* (quoting *Dawes*, 239 F.3d at 492). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Id.* at 353 (quoting *Dawes*, 239 F.3d at 493).

Kenlock's claims against Bloise do not satisfy this standard. Additional searches and pat frisks, verbal harassment, an alleged unsuccessful attempt to induce Kenlock to violate jail rules for borrowing razors, and a less-than-one-day lockdown do not constitute adverse actions under the *Davis v. Goord* standard. *Cf. Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (holding three weeks in keeplock to be adverse action); *Burns v. Martuscello*, 890 F.3d 77, 93-94 (2d Cir. 2018) (holding six months in involuntary protective custody to be adverse action). All of these actions taken together also do not suffice to state a retaliation claim against Bloise. *Cf. Kotler v. Boley*, No. 21-1630, 2022 WL 4589678, at *2 (2d Cir. Sept. 30, 2022) (holding that a cell search, a filing of false misbehavior report, and false testimony at a misbehavior hearing resulting in several months of disciplinary confinement could "collective[ly]" constitute an adverse action).

Nor does Kenlock state a retaliation claim as to the remaining Appellees. Even assuming that he has plausibly alleged a denial of mental health services and that such denial was an adverse action, he makes no nonconclusory allegations linking that adverse action to constitutionally protected conduct. To state a claim, a plaintiff must plead a causal link between his protected

7

conduct and subsequent adverse action.  *See Davis*, 320 F.3d at 352.  Kenlock has not done so.

We thus affirm the district court's dismissal of his retaliation claims.[3]

*     *     *

We have considered all of Kenlock's remaining arguments and find them to be without merit.  For the foregoing reasons, the judgment is **AFFIRMED.**

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

---

[3] Kenlock also argues that the withholding of mental health services is actionable under the Fourteenth Amendment as a denial of medical care creating unconstitutional conditions of confinement. To state a claim for deliberate indifference under the Fourteenth Amendment, a plaintiff must allege "both (a) conditions that objectively 'pose an unreasonable risk of serious damage to . . . health'; and (b) that the 'defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to health or safety.'"  *Vega v. Semple*, 963 F.3d 259, 273-74 (2d Cir. 2020) (emphasis in original) (internal footnote and citation omitted) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 30, 35 (2d Cir. 2017)).  Kenlock has not alleged sufficient facts for a reasonable jury to conclude that any denial of mental health services posed an unreasonable risk of serious damage to his health.  *See Charles v. Orange County*, 925 F.3d 73, 86 (2d Cir. 2019) (noting that, while psychological conditions can sometimes present serious medical needs, the relevant standard "contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain").