15-1631
Burns v. Martuscello

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2017

(Argued: October 11, 2017                           Decided: May 9, 2018)

Docket No. 15-1631

_____

MARK BURNS,

*Plaintiff-Appellant*,

v.

DANIEL F. MARTUSCELLO, JR., Superintendent, Coxsackie Correctional
Facility, CAPTAIN SHANLEY, Coxsackie Correctional Facility, SERGEANT
NOEH, Coxsackie Correctional Facility, SCHWEBLER, Guidance Counselor,
Coxsackie Correctional Facility, BRIAN FISCHER, Commissioner of New York
State Department of Corrections, TERESA KNAPP-DAVID, Director of
Movement and Control, New York State DOCCS, MCGLYNN, Guidance
Counselor, Coxsackie Correctional Facility,[1]

*Defendants-Appellees*.

_____

---

[1] The clerk is respectfully directed to amend the caption as above.

Before: WALKER and POOLER, *Circuit Judges*, CRAWFORD, *District Judge*.[2]

Appeal from United States District Court for the Northern District of New York (Lawrence E. Kahn, *J.*; Christian F. Hummel, *M.J.*) granting summary judgment to defendants on a First Amendment retaliation claim, and Eighth and Fourteenth Amendment claims related to plaintiff Mark Burns's placement in restricted custody after he refused (i) to serve as a prison informant, or (ii) to provide false information regarding an incident within the facility. With regard to the First Amendment retaliation claim, we hold that the First Amendment protects a prisoner's right not to serve as a prison informant or provide false information to prison officials. Because we have not previously recognized this speech and speech-related activity as protected by the First Amendment, we nonetheless affirm the judgment of the district court on qualified immunity grounds.

Affirmed.

_____

[2] Judge Geoffrey W. Crawford, United States District Court for the District of Vermont, sitting by designation.

2

NOAM BIALE, Sher Tremonte LLP (Michael W. Gibaldi, *on the brief*), New York, N.Y., *for Plaintiff-Appellant Mark Burns*.

ROBERT M. GOLDFARB, Assistant Solicitor General (Barbara D. Underwood, Andrew D. Bing, *on the brief*), *for* Eric T. Schneiderman, Attorney General of the State of New York, Albany, N.Y., *for Defendants-Appellees Daniel F. Martuscello et al.*

POOLER, *Circuit Judge*:

Plaintiff-Appellant Mark Burns appeals from a February 10, 2015 decision and order of the United States District Court for the Northern District of New York (Kahn, *J.*), adopting the report-recommendation of the magistrate judge (Hummel, *M.J.*) in its entirety, and granting summary judgment to defendants. Burns brought several Section 1983 claims, alleging that his First, Eighth, and Fourteenth Amendment rights were violated when he was put on a restricted status known as Involuntary Protective Custody ("IPC") for over six months, after he refused the demands of prison guards to act as a "snitch," or to falsify his account of a minor incident in the commissary. With regard to the First Amendment retaliation claim, the district court reasoned that Burns was not engaged in protected speech or conduct, because the First Amendment did not protect Burns's refusal to snitch.

3

Today we hold that the First Amendment protects both a prisoner's right not to serve as an informant, and to refuse to provide false information to prison officials. We have previously held that citizens enjoy a First Amendment right to refuse to provide false information to the government, but have not previously recognized this right in the prison context. *See Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011). With regard to a prisoner's right not to snitch, we have not previously reached this issue—though we have encountered it and declined to decide it on at least two prior occasions. *See Willey v. Kirkpatrick*, 801 F.3d 51 (2d Cir. 2015); *Allah v. Juchenwioz*, 176 F. App'x 187, 189 (2d Cir. 2006) (summary order). Because these rights were not clearly established at the time of the events underlying this suit, the defendants are entitled to qualified immunity. For these reasons, we affirm the judgment of the district court.

## BACKGROUND

### I. Facts

Burns is an inmate in the custody of the New York State Department of Corrections and Community Supervision, and, at all times relevant to his claims, was an inmate at Coxsackie Correctional Facility. As we must at summary judgment, we credit Burns's account of events, and draw all reasonable

4

inferences in his favor. *See Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 54 (2d Cir. 2017), *as amended* (Aug. 21, 2017).

Burns began working as a stock clerk in the Coxsackie commissary beginning in April of 2010.  According to Burns, on May 19, 2010, he was in the commissary removing stock from shelves, when a can fell from a high shelf and struck him in the face and neck. Burns suffered minor injuries—namely, redness on his face, which subsequently became a small bruise, and a scratch on his neck. Burns reported the injury to commissary staff and signed a medical waiver. The next day, May 20, an inmate injury report was filed, indicating that Burns had been injured by a falling can in the commissary.

Also on May 20, 2010, Burns asserts that he was again working in the commissary when he was approached by defendants Sergeant Noeh and Captain Shanley. Noeh and Shanley told Burns that his wife had called and complained that Burns had been "cut" by a fellow inmate. Report-Recommendation and Order at 4, *Burns v. Martuscello*, 13-cv-486, ECF No. 46 (N.D.N.Y. Dec. 18, 2014). In Burns's telling of the events, he denied having any altercation with a fellow inmate. Burns also pointed out that he had no cut, and that his apparent, minor injuries were the result of the can falling on him the day before. Burns further

explained that a correctional officer assigned to the commissary had witnessed the accident and documented it as a work-related injury. Burns also questioned whether his wife made any such call. However, Burns told Noeh and Shanley that he had recently been experiencing marital difficulties, and theorized that if his wife had in fact called, it was due to their marital discord.

According to Burns, Shanley then proposed a deal. He told Burns that he intended to recommend Burns for placement in IPC, citing the call from Burns's wife as an indication of a threat to Burns's safety. But, Shanley offered to let Burns avoid this restricted status if Burns agreed to be the guards' snitch. Shanley and Noeh did not say that that they had a particular reason to believe Burns would have information, but instead said that Burns knew "what goes on." Joint App'x at 48. If Burns didn't agree to this arrangement, the guards threatened that Burns would be relegated to IPC indefinitely. Burns refused to go along with the guards' request. Shanley then instructed Noeh to write an IPC recommendation. In the subsequent IPC recommendation, Noeh noted that Burns's wife called and reported he was cut, that Burns had a bruised left eye but no visible cut, and that Burns reported that a can fell on him, causing the bruise.

6

On May 26, 2010, a hearing commenced to determine whether Burns would be put in IPC. Burns opposed the transfer. Burns indicated that he would like to call as a witness correctional officer Jablanski, who had been assigned to the commissary when the can fell, and the hearing adjourned.

According to Burns, at some point near the initial hearing—about a week after the can fell—Shanley and Martuscello approached Burns and repeated the demand that Burns be "their snitch." Shanley and Martuscello also said that they "had a new theory that [Burns] was assaulted by staff and that when [Burns] agreed to snitch [he] would be let out but until then [he] could rot in IPC." Joint App'x at 22.

The hearing resumed on June 7, 2010. Officer Jablanski testified that he recalled that a can fell from the top shelf and hit Burns in the face, and that Burns reported the event to him. Jablanski also noted that he logged the injury. Noeh then testified that Burns's wife called and reported that Burns had been "cut." Supp. App'x at 69. Noeh further testified that Burns "had no cuts on him but he had a black eye, which he claimed he got from a can falling." Supp. App'x at 69. When asked if he knew whether there was "a threat to Mr. Burns['] safety within the general inmate population" at Coxsackie, Noeh replied, "[i]f I go by the

inmate[']s word, no." Supp. App'x at 69. Shanley then testified that he recommended Burns for IPC status after receiving a phone call from Burns's wife and determining that Burns's injuries were consistent with having an altercation.

That same day, June 7, 2010, the hearing officer approved Burns's placement in IPC. Burns was then transferred to IPC, where he remained until January 2011. This status mandated that Burns remain in his cell for 23 hours a day, and dramatically curtailed his access to the library, religious services, and other prison resources.

Burns further recounts that while he was in IPC, Shanley and Martuscello repeatedly demanded that Burns serve as their snitch in order to be released from restricted custody. According to Burns, at one point, Martuscello stopped by Burns's cell, and, when Burns protested to be released from IPC, Martuscello replied that "only [Martuscello] had the power to change [the] situation," and that "the only way that would happen was agree to snitch other wise [sic] [Burns] could rot here," in IPC. Joint App'x at 23. Burns also reports that the officers continued to pressure him to change his account of how he received his injuries. Burns explained time and again that his injuries were the product of a minor workplace mishap, but the guards continued to ask him for a version of

8

events that implicated a guard. In response to these requests, Burns reiterated to the officers that he "couldn't give them anything that [he] d[id]n't know," but the officers insisted that Burns should "give [them] some knowledge and [Burns] would be able to get out." Joint App'x at 50, 43.

During his time in IPC, Burns filed numerous grievances related to his IPC status. After over six months in IPC, Burns was ultimately released from the restricted status upon his transfer to a different correctional facility in early 2011.

## II. Procedural History

On April 30, 2013, Burns filed suit pro se, alleging violations of his constitutional rights. The district court construed Burns's complaint to raise violations of the First, Eighth, and Fourteenth Amendments. Following discovery, defendants moved for summary judgment, asserting that Burns failed to exhaust administrative remedies, and that the record evidence did not support his Eighth and Fourteenth Amendment claims.

The magistrate judge found that Burns had established a genuine issue of material fact regarding exhaustion, but ruled that Burns had failed to establish claims to relief under the Eighth or Fourteenth Amendments. With respect to the First Amendment retaliation claim, the magistrate judge reasoned Burns was not

engaged in protected speech or conduct, since no court has previously held that there was a right to refuse to serve as a prison informant. Defendants did not assert the defense of qualified immunity in their motion for summary judgment, and the magistrate judge did not reach the question. The district court adopted the recommendation of the magistrate in its entirety.

Burns appealed. We appointed counsel for the limited purpose of briefing whether there is a constitutional right to refuse to become a prison informant, and dismissed the remainder of Burns's appeal.

**DISCUSSION**

"A grant of summary judgment is reviewed de novo, construing the facts in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor." *Kazolias v. IBEW LU 363*, 806 F.3d 45, 49 (2d Cir. 2015). "But because prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we are careful to require non-conclusory allegations." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)) (internal quotation marks omitted).

In order for a prisoner's First Amendment retaliation claim under Section 1983 to survive summary judgment, a prisoner must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

This appeal centers on the question of whether Burns was engaged in protected speech or conduct when he refused to serve as a snitch. Neither we nor the Supreme Court have squarely addressed this question previously. *See Willey v. Kirkpatrick*, 801 F.3d 51, 66 (2d Cir. 2015) (declining to rule on whether there is a right not to serve as a prison informant); *Allah v. Juchenwioz*, 176 F. App'x 187, 189 (2d Cir. 2006) (summary order) (similarly declining to rule). We now hold that the First Amendment protects a prisoner's right not to serve as an informant.

Burns's refusal to alter his account of how he received his minor injuries or otherwise fabricate information also raises the question of whether an inmate retains the right to refuse to provide false information to government officials,

11

recognized previously in a different context in *Jackler*, 658 F.3d 225. We today hold that this right extends to prisoners.

**I.     The Right Not to Speak**

As a general matter, the First Amendment protects the "right to decide what to say and what not to say." *Jackler*, 658 F.3d at 241. "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). To force a person to speak,[3] and compel participation, is a severe intrusion on the liberty and intellectual privacy of the individual. Just as compelled silence will extinguish the individual's right of expression, compelled speech will vitiate the individual's decision either to express a perspective by means of silence, or to remain humbly absent from the arena. In *Riley v. National Federation of the Blind of North Carolina, Inc.*, the Supreme Court explained,

---

[3] To be clear, we here refer only to speech made by an individual in her or his private capacity. We are not presently concerned with, for example, advertising requirements, which the Supreme Court has observed involve interests that "are not of the same order as those discussed in *Wooley* … and *Barnette*." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). Nor are we reviewing "disclosure requirements in the electoral context," which are subject to distinct considerations. *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010).

There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees "freedom of speech," a term necessarily comprising the decision of both what to say and what *not* to say.

487 U.S. 781, 796–97 (1988) (emphasis in original).

The right not to speak derives largely from the notion, central to our system of government, that the individual's right to "freedom of mind" must be jealously guarded. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). Preserving the "freedom to think as you will and to speak as you think" is both an inherent good, and an abiding goal of our democracy. *Whitney v. California*, 274 U.S. 357, 375 (1927), *overruled in part by Brandenburg v. Ohio*, 395 U.S. 444 (1969) (Brandeis, *J.*, concurring). In service of this core component of liberty, our jurisprudence recognizes a "sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Barnette*, 319 U.S. at 642.

In our view, compelled speech presents a unique affront to personal dignity. The decision to withhold speech depends on views and calculations known only to the individual. And since the individual seeks to refrain from speaking, those motivations are all the more obscure, and privately held. *See*

13

Abner S. Greene, *The Pledge of Allegiance Problem*, 64 Fordham L. Rev. 451, 473 (1995) ("[T]he right not to speak is the right not to reveal one's mind publicly."). Accordingly, the right *not* to speak may be abrogated only under carefully policed circumstances. As the Supreme Court has explained, between compelled silence and compelled speech, compelled speech is the more serious incursion on the First Amendment: "It would seem that involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence." *Barnette*, 319 U.S. at 633.

In *Barnette*, the Supreme Court held that the state could not require students to salute the flag. *Id.* at 642. The Court found that the requirement "requires affirmation of a belief and an attitude of mind," and reflected an attempt by officials to "coerce acceptance of [a] patriotic creed." *Id.* at 633-34. Such an intrusion was a significant burden on the "right of self-determination in matters that touch individual opinion and personal attitude." *Id.* at 631. As a result, the Court held that the compelled salute impermissibly "invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.* at 642.

Subsequently, in *Wooley*, the Supreme Court ruled that New Hampshire could not compel its citizens to advertise the slogan "Live Free or Die" on their vehicle license plates. 430 U.S. at 713. The Court reasoned that requiring even "the passive act of carrying the state motto on a license plate" violated the First Amendment, because it converted the plaintiff into "an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Id.* at 715.

*Barnette* centered on speech of an overtly political nature, and political speech has long stood at the "core" of First Amendment rights. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995*)*. However, the protections of the First Amendment are hardly confined to political speech—and the Supreme Court repeatedly "has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage based on an ad hoc balancing of relative social costs and benefits.'" *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion) (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)) (internal punctuation omitted). Indeed, the motto "Live Free or Die" at issue in *Wooley* cannot be fairly categorized as traditional political speech. Rather, *Wooley* expanded on *Barnette*'s notion of First Amendment protection for individual

15

matters of opinion and morality—"the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control," *Wooley*, 430 U.S. at 715 (quoting *Barnette*, 319 U.S. at 642)—and articulated a strong view of First Amendment protection for matters of personal philosophy and morality.

We have also recognized that the First Amendment right not to speak protects the right to refuse to make false statements to the government. *See Jackler*, 658 F.3d at 241. In *Jackler*, a probation officer filed a report against a fellow officer, asserting that the officer had used excessive force on an arrestee. *Id.* at 230. Other members of the police force then attempted to coerce the plaintiff into withdrawing his report. *Id.* at 231. When he did not, he was terminated. *Id.* at 232.

We found that a First Amendment retaliation claim could lie based on the right not to speak. Drawing on *Wooley* and *Barnette*, as well as a citizen's right to give truthful evidence, we reasoned that the officer had a First Amendment right to refuse to make false statements to the government: "a citizen has a First Amendment right to decide what to say and what not to say, and, accordingly, the right to reject governmental efforts to require him to make statements he

believes are false." *Id.* at 241. We further held that "the First Amendment protects the rights of a citizen to refuse to retract a report to the police that he believes is true, to refuse to make a statement that he believes is false, and to refuse to engage in unlawful conduct by filing a false report with the police." *Id.*

## II. Limited First Amendment Interests of Prisoners

While an individual is not stripped of all constitutional rights upon incarceration, an inmate's constitutional liberties are necessarily limited. "A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004) (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995)) (internal punctuation omitted); *see also Pell v. Procunier*, 417 U.S. 817, 822 (1974). Accordingly, while "[i]nmates clearly retain protections afforded by the First Amendment," *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987), "the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere," *Beard v. Banks*, 548 U.S. 521, 528 (2006) (plurality opinion). At bottom, "[t]he governing standard is one of reasonableness." *Shakur*, 391 F.3d at 113 (quoting

17

*Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)) (internal punctuation omitted).

The majority of the jurisprudence evaluating the scope of a prisoner's First Amendment rights arises in the context of a challenge to a generally applicable prison policy or regulation. *See, e.g.*, *Pilgrim v. Luther*, 571 F.3d 201, 204-05 (2d Cir. 2009) (challenge to prison regulation prohibiting organizations of strikes or work stoppages); *Shaw v. Murphy*, 532 U.S. 223, 225 (2001) (challenge to policies governing inmate communication with one another regarding legal claims). In evaluating such a policy or regulation, courts employ the framework outlined by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 89-91 (1987). The *Turner* inquiry requires us to examine several factors: (1) whether the policy or regulation is "reasonably related to legitimate penological interests;" (2) whether "there are alternative means of exercising the right that remain open;" (3) "the impact that accommodation of the asserted constitutional right will have on guards and inmates;" and (4) whether "ready alternatives" in prison policy that would accommodate the right exist, indicating that the policy is "an exaggerated response to prison concerns." *Id.* (internal citations and punctuation omitted).

18

Here, we do not confront a generally applicable policy or regulation, and thus the *Turner* framework is not directly applicable. *Cf. Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (noting that prisoners' Fourth Amendment challenges proceed under *Turner* when "a prison regulation or policy" is at issue, while distinct reasonableness inquiry generally applies to "isolated" incidents). Rather, Burns alleges that a single incident—his placement in IPC—was in retaliation for the exercise of First Amendment rights. As a result, certain aspects of the *Turner* framework do not apply here. For example, questions about alternative means of expressing the right are ill-fitting in a single incident case. And indeed, the rights that Burns asserts are not amenable to alternative modes of expression. There is no middle ground between silence and speech. Nonetheless, because *Turner* itself discussed the First Amendment rights of prisoners, and outlined certain guiding considerations in prisoner cases, we find that the "several *Turner* factors are relevant to the question of whether [an inmate's] speech is an activity protected by the First Amendment." *Watkins v. Kasper*, 599 F.3d 791, 797 (7th Cir. 2010).

Specifically, the first *Turner* factor is undoubtedly relevant to a single-incident case, and we take care to emphasize the heightened role of security interests in the prison context. "[M]aintaining prison security and protecting

19

against increased inmate violence" is "central to all other corrections goals."

*Duamutef v. Hollins*, 297 F.3d 108, 112 (2d Cir. 2002) (quoting *Senkowski*, 54 F.3d at 1054; *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989)). And, as we have observed, "prison officials must be given latitude to anticipate the probable consequences of certain speech, and must be allowed to take reasonable steps to forestall violence." *Id.* (quoting *Giano*, 54 F.3d at 1055) (internal punctuation omitted).

Further, the concern that prison officials may obviously be engaging in an "exaggerated response" is also relevant to a single incident case. *Turner*, 482 U.S. at 87. Our review of actions taken by prison officials is "deferential," *Ford v. McGinnis*, 352 F.3d 582, 595 (2d Cir. 2003), but, just as a policy may clearly place too great a burden on inmates' rights, so too may a single incident plainly constitute an outsize reaction to prison administration concerns.

In *Turner* itself, the Supreme Court ruled that a Missouri rule prohibiting communications between inmates at different institutions, subject to certain exceptions, did not violate the First Amendment. 482 U.S. at 81-82. The Court did not question that inmates held a First Amendment interest in the speech, but focused on the policy's relationship to curtailing coordination among inmates for violent acts and gang related activity. *Id.* at 91. The Court emphasized the

minimal reach of the regulation, which "bars communication only with a limited class of other people with whom prison officials have particular cause to be concerned—inmates at other institutions." *Id.* at 92. Finally, the Court found that the lack of available alternatives, and the strain on institutional resources that would be generated by an individualized review of communications, militated in favor of the measure's constitutionality. *Id.* at 93.

Following *Turner*, we have many times encountered challenges to prisoner mail policies. We have repeatedly held, in line with the Supreme Court's reasoning in *Turner*, that a prisoner retains a First Amendment interest in their communications. As we have noted, "a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). Nonetheless, the right is subject to significant limitation in light of countervailing interests within the correctional system. *See, e.g., Johnson v. Goord*, 445 F.3d 532, 535 (2d Cir. 2006) (employing *Turner* framework to uphold prison policy allowing each prisoner one free stamp per month for personal use).

On a handful of occasions, we have considered First Amendment suits arising from specific, isolated actions by guards. In *Shakur v. Selsky*, we

21

considered whether guards' confiscation of reading New Afrikan political literature "pursuant to personal prejudices" violated an inmate's First Amendment rights. 391 F.3d 106, 116 (2d Cir. 2004) (internal quotation marks omitted). We reasoned that such an "improper objective" was inconsistent with any reasonable penological purpose. *Id.* As a result, we found that the confiscation allegations amounted to "a legally sufficient claim of unconstitutional infringement of [the inmate's] First Amendment right to free expression." *Id.* at 117.

In *Meriwether v. Coughlin*, we upheld a jury verdict finding First Amendment retaliation where inmates who were "outspoken critics of the [prison] administration" were transferred to new facilities. 879 F.2d 1037, 1046 (2d Cir. 1989). The prison suffered from corruption and lax security procedures, and inmates became vocal about the poor state of affairs within the institution. *Id.* at 1039. Specifically, several prisoners "corresponded with state officials and public interest organizations about the problems at [the prison], and many attended [a] meeting at which media contact was demanded." *Id.* at 1046. In response, prison officials had the inmates transferred and dispersed throughout various facilities. We recognized that the inmates' speech was protected by the

22

First Amendment, and explained that they had made out a retaliation claim because "a reasonable jury could find that the plaintiffs were transferred solely because they exercised their First Amendment rights." *Id.*

### III. The Right Not to Snitch

Applying these principles, we find that Burns held a strong First Amendment interest in refusing the demands of the guards that he provide both false information, and truthful information on an ongoing basis. At the most basic level, Burns's claims derive from the guards' attempt to force him to speak against his will. The right not to speak, as articulated in *Barnette*, *Wooley*, and *Jackler*, safeguards a humble but vitally important restraint on the government's coercive powers. And, in light of the unobtrusive but foundational nature of the right not to speak, we think it clear that inmates generally retain a First Amendment interest in declining to speak.

Of course, the right not to snitch implicates speech that is not a simple expression of opinion. Crediting Burns's version of events and drawing all reasonable inferences in his favor, as we must on appeal from summary judgment, Burns's case presents the questions of whether an inmate may, consistent with the First Amendment, be forced to (i) provide false, inculpatory

23

information to guards, by fabricating events or falsely casting blame for injuries sustained from a workplace mishap; or (ii) provide true, inculpatory information to guards by acting as their snitch. Invoking *Turner*, defendants urge that their actions were in service of prison safety, and that, as a result, Burns cannot be said to have engaged in First Amendment protected speech in refusing to submit to the guards' demands. However, as we explain, forcing an inmate to snitch, at least on the facts presented here, is not reasonably related to that goal. Nor is compulsion to provide false information. Accordingly, we hold that the First Amendment protects an inmate's refusal both to serve as a prison informant and to provide false information.

### A. *Jackler* and the Right to Refuse to Provide False Information

To dispose of the simpler question first—it is eminently clear to us that the First Amendment protects an inmate's right to refuse to provide false information to prison officials. As we held in *Jackler*, an individual holds "a First Amendment right to decide what to say and what not to say, and, accordingly, the right to reject governmental efforts to require him to make statements he believes are false." 658 F.3d at 241. We see no basis to circumscribe this right in the prison context. No legitimate penological objective is served by forcing an

24

inmate to provide false information. Truth is vital to security. Inaccurate incrimination of others—as the guards are alleged to have sought from Burns here—could lead only to unwarranted punishment. Such arbitrary and manifestly unjust outcomes would plainly undermine the integrity of the correctional system. Accordingly, though we have not previously considered whether the First Amendment rights discussed in *Jackler* extend to the prison context, we have little difficulty concluding that they do.

Indeed, Burns's experience with his workplace injury neatly parallels the allegations in *Jackler*. In both instances, an initial report was made, and officials pressured the plaintiffs to change their accounts of the events in question. Though in *Jackler* we were concerned with an officer's right not to retract a report and falsely absolve another of wrongdoing, this same logic naturally extends to the situation here, where officials sought to force the false incrimination of others. Thus it is plain to us that the First Amendment protects an inmate's refusal to provide false information. Accordingly, by refusing to invent false information, Burns was engaged in First Amendment protected speech.

### B. The Right Not Serve as a Prison Informant on an Ongoing Basis

We also conclude that the First Amendment protects Burns's refusal to act as the guards' snitch by providing truthful information. We begin by observing the nature of the speech in question. Safety risks as well as legitimate concerns about personal loyalty play a role in the decision to divulge information and incriminate others. Thus the Supreme Court's reasoning in *Wooley* and *Barnette*, and the notion of autonomy and "individual freedom of mind" as guiding First Amendment principles, are central to the instant matter. *Wooley*, 430 U.S. at 714 (quoting *Barnette*, 319 U.S. at 637).

Further, while the speech at issue is not overtly political—in the sense that it does not involve, for example, campaigning for a candidate—neither is it purely personal. The guards sought continued information regarding the general illicit goings on in the prison—not information about Burns's personal relationships. And the governance of our criminal justice system, and the methods that may be undertaken in the maintenance of that system, are plainly matters of broad public concern. *See Johnson v. California*, 543 U.S. 499, 511 (2005) (observing that "society as a whole suffers" when prison officials' actions run afoul of generally applicable constitutional principles).

Indeed, outrage regarding similar investigative methods of the British was a major cause of the Revolution, and guided the Framers in crafting the Bill of Rights. The "reviled 'general warrants' and 'writs of assistance' of the colonial era … allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 134 S. Ct. 2473, 2494 (2014). According to the writings of John Adams, the writs also allowed officers to "enter all houses, shops, etc at will, and command all to assist him." Charles Francis Adams, *The Works of John Adams, II*, 524 (1856). As Justice Gorsuch recently recounted, such practices ignited the fury of the colonists largely because they forced individuals to serve as "snitches and snoops" for the Crown. Transcript of Oral Argument at 82, *Carpenter v. United States*, 484 U.S. 19 (2018). In 1761, James Otis denounced the writs as "the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law book," in a Boston debate, and John Adams subsequently described the agitation provoked by the writs, writing, "then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born." *Boyd v. United States*, 116 U.S. 616, 625 (1886) (quoting Cooley, Const. Lim. 301-03).

Generally, it is understood that these concerns provided the foundation for the Fourth Amendment. *See United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 327 (1972) ("[I]t was such excesses as the use of general warrants and the writs of assistance that led to the ratification of the Fourth Amendment."). And indeed, Fourth Amendment jurisprudence has long recognized a right analogous to the one we recognize today: the right to walk away from police questioning. When an individual, unsuspected of wrongdoing, is approached by a law enforcement officer, the individual "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *United States v. Hooper*, 935 F.2d 484, 490 (2d Cir. 1991) (quoting *Florida v. Royer*, 460 U.S. 491, 497-98) (1983); *see also Terry v. Ohio*, 392 U.S. 1, 32-33 (1968) (Harlan, *J.*, concurring).

Here, by refusing to serve as a snitch, Burns sought to exercise a right akin to the right, enjoyed by members of the public at large, to decline to participate in police questioning. In both cases, a government officer seeks information from an individual who is not under suspicion. In the case of the unconfined individual, she may walk away. But in the case of the prisoner, she cannot walk away, as she is physically incarcerated within the institution. Thus her only recourse is in

28

speech: she may decline to answer. Accordingly, the speech that we recognize today as protected by the First Amendment fits well within a broader frame of constitutional protection from the government's ability to compel participation in investigative measures.

We also must emphasize the extreme risk that attends the act of snitching in the prison context. "When evaluating compelled speech, we consider the context in which the speech is made." *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 249 (2d Cir. 2014) (citing *Riley*, 487 U.S. at 796–97). Here, the prison setting weighs heavily on our analysis. It is a sobering and deplorable fact that violence occurs with regularity in far too many of our nation's correctional institutions. It is also well understood that inmates known to be snitches are widely reviled within the correctional system. In light of these facts, a number of courts have found an Eighth Amendment violation where a guard publicly labels an inmate as a snitch, because of the likelihood that the inmate will suffer great violence at the hands of fellow prisoners. *See, e.g.*, *Irving v. Dormire*, 519 F.3d 441, 450-51 (8th Cir. 2008); *Benefield v. McDowall*, 241 F.3d 1267, 1270-71 (10th Cir. 2001); *Watson v. McGinnis*, 964 F. Supp. 127, 131 (S.D.N.Y. 1997) (collecting cases). If a prison snitch is found out, then the inmate's forced service as an informant

29

may well prompt life-threatening physical harm. And even if the informant is never unmasked, she must shoulder the burden of the knowledge that, if her status as a snitch ever does come to light, violence may well befall her.

For these same reasons, the degree of the intrusion on the inmate's constitutional interests is severe. In *Wooley*, the Court compared the flag salute at issue in *Barnette* to the license plate motto, and observed,

> Compelling the affirmative act of a flag salute involved a more serious infringement upon personal liberties than the passive act of carrying the state motto on a license plate, but the difference is essentially one of degree.

*Wooley*, 430 U.S. at 715. The act of providing information about general criminal goings on of a prison is appreciably more active than the salute in *Barnette*: the guards sought to have Burns affirmatively report information about the wrongdoing of others, on potentially an ongoing basis, contrary to his wishes and at great physical peril. Put another way, the act of disclosing inculpatory information about other inmates requires a good deal more of the individual than a salute. More than a gesture is at stake.

Concurrently, we think it significant that the prison setting amplifies the degree of the incursion beyond the moment of reporting inculpatory

30

information. The subjects of an informant's reporting either live or work in the same facility where the informant is confined. It is likely that the inmates or guards implicated by the informant are within the informant's immediate surroundings, rather than the remote reaches of the facility, and that this regular contact provided the foundation for the informant's report. Thus the jailhouse snitch is imprisoned alongside the very individuals that pose the greatest risk to her safety, creating a unique burden on the liberty interests of the individual inmate.

We also think it clear that forcing an inmate to serve as an informant on an ongoing basis is not reasonably related to a legitimate penological purpose—namely, safety. It is of course possible, as a general matter, that information obtained compulsorily from prisoners may provide officials with some advantage in maintaining order. But not all inmates will be able to obtain or provide information that in fact would be useful to preserve safety within the institution. And, indeed, forcing inmates to serve continuously as snitches may well prompt further violence, as others may seek retribution for perceived betrayals. Coercing inmates to serve as informants is, at best, an "exaggerated

response to prison concerns." *Turner*, 482 U.S. at 90 (internal quotation marks omitted).

Thus it is clear to us that the actions of the guards here were an unreasonable incursion on Burns's First Amendment rights. The requests from the guards indicate that they sought general information from Burns about any illicit goings-on at the facility that Burns might become aware of in the future. As discussed above, such an obligation is a heavy burden for any inmate to bear. And the record does not reflect any hefty countervailing considerations that might have outweighed Burns's strong constitutional interest under the circumstances at hand. Rather, it appears that the prison was experiencing relatively run of the mill operations, when guards attempted to conscript Burns into serving as a covert ally among the inmate population. Crediting Burns's version of events, it appears that he was singled out because he made an easy mark: the mild injuries he sustained from the falling can allowed the guards to credibly assert that Burns was at risk within the facility, and thus gave the guards the opportunity to place Burns in restricted custody for an extended period in order to pressure Burns to cede to their demands. Drawing all inferences in Burns's favor, as we must, such an arbitrary incursion on Burns's

32

First Amendment rights as alleged here cannot be countenanced under our constitutional system.

In support of their assertion that the First Amendment does not protect the speech in question, defendants direct our attention to the government's power to subpoena witnesses, and contend that the First Amendment is not implicated here because of the longstanding rule that "the public has a right to every man's evidence." *United States v. Nixon*, 418 U.S. 683, 709 (1974) (internal ellipsis omitted). But this argument is unavailing. First Amendment rights are clearly at stake when a person gives evidence. *See Jackler*, 658 F.3d at 239 ("Voluntarily appearing as a witness in a public proceeding or a lawsuit is a kind of speech that is protected by the First Amendment.") (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 210 (2d Cir. 1995)). And, while the government may compel a witness to divulge evidence under appropriate circumstances, the considerations governing the constitutional inquiry into such a compulsion are quite distinct from the instant matter.

First, this long-observed principle does not entitle the government to all evidence under all circumstances, as defendants suggest. The Fifth Amendment, for example, constrains the government's ability to force self-incrimination. And

33

a subpoenaed witness enjoys protections utterly unattainable for the inmate. A subpoena can be contested, and a court may quash or limit the scope of the subpoena if it is overbroad, or otherwise abusive of an individual's rights and privileges. *See, e.g., In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 160 (2d Cir. 2002) (quashing subpoena that would have required attorney testimony violating work product doctrine).

Burns's case itself provides a dramatic example of the difference between a subpoenaed witness and a potential prison informant. Burns was put on a highly restrictive status for over six months when he refused vague and repeated demands for information. According to Burns, the guards simply wanted someone to act as their snitch—indicating that the potential subjects and scope of the guards' interest were near limitless within the facility. This is hardly akin to a witness being called to recount specific facts relevant to an investigation or trial proceeding.

Accordingly, the longstanding evidentiary principle that "the public has the right to every man's evidence," *Nixon*, 418 U.S. at 709, is no bar to finding First Amendment protection here.

34

It is worth noting what we are not deciding. Burns has alleged that he responded truthfully to the officers' questions about what happened with the can. Therefore, we need not, and do not, address whether Burns had a First Amendment right to refuse to give truthful information about a past event, or in an emergency. We also wish to underscore that the rights at issue here do not implicate the widespread practice of conditioning pleas or other favorable prosecutorial treatment on the provision of information. Under such circumstances, the government confers a benefit on the potential informant, in the form of relief from warranted criminal or other adverse action. By contrast, we here are concerned with the distinct circumstances of an inmate punished only in retaliation for refusing to provide information as it may come to the inmate's attention on an ongoing basis.

Again, the case before us is illustrative. Construing the evidence in Burns's favor, there is no indication that Burns himself was engaged in wrongful conduct. Burns was given a choice between snitching or incurring an otherwise underserved punishment. The distinction is of appreciable significance. It means that the government may withdraw a benefit—by, for example, refusing to lessen

charges where the would-be informant declines to offer information—but may not impose punishments at random.

Accordingly, for these reasons, we conclude that the refusal to provide false information and to serve as a snitch on an ongoing basis are protected by the First Amendment.

**IV.    Retaliation**

Having concluded that Burns's speech was protected by the First Amendment, we proceed to the remaining portions of the retaliation inquiry: an adverse action against the plaintiff, and a causal connection between the protected speech and the adverse action. *Dolan*, 794 F.3d at 294. Neither prong is in serious doubt.

Burns was put in IPC for over six months, significantly impairing his ability to move within the facility, socialize, and engage with prison programming. And Burns gave detailed testimony about the threats he received from defendants, to the effect that he must serve as a snitch and change the explanation of how he received his injuries, or else remain in IPC. Portions of Burns's testimony also are corroborated by documentary evidence and the testimony of prison officials. For example, the commissary officer testified that

36

the can did in fact fall on Burns, and the IPC referral paperwork indicates that defendants did not observe a cut on Burns's person.

We have previously held that a retaliation claim may lie where an inmate suffers the adverse action of "the filing of false misbehavior reports … [and the] sentence of three weeks in keeplock—[because] that would deter a prisoner of ordinary firmness from vindicating his or her constitutional rights through the grievance process and the courts." *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004). Here, Burns has provided evidence that he was subjected to a pretextual IPC hearing, and placed on this restricted status for over six months. Such an injury more than suffices to show an adverse action.

Burns has also presented sufficient evidence of causation. His IPC status hearing centered entirely on the questions related to injuries Burns suffered when struck by the can. Burns also testified that defendants told him on more than one occasion that he was referred to the IPC and left there because he declined to serve as a snitch. Such testimony raises a question of material fact for the jury. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (finding evidence of causation sufficient to defeat summary judgment based on "alleged admission of the existence of a retaliatory scheme" by guard).

For these reasons, we conclude that Burns made a sufficient showing of First Amendment retaliation.

**V.    Qualified Immunity**

Qualified immunity protects government officials from liability for civil damages unless a plaintiff demonstrates "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) (quoting *Wood v. Moss*, 134 S.Ct. 2056, 2066-67 (2014)) (internal quotation marks omitted). "Although we generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right, the absence of a decision by this Court or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Okin v. Vill. of Cornwall–on–Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009); *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000)) (internal punctuation omitted).

38

On the facts presented here, we conclude that the defendants are entitled to qualified immunity.[4] *Jackler* was not decided until late 2011, well after Burns was released from IPC. And we have not previously held that the First Amendment protects the right not to snitch. Nor do we believe that prior decisions clearly foreshadowed our decision today. By the time of the events in question, we had issued one summary order noting the possibility of a right not to serve as a prison informant. *Allah v. Juchenwioz*, 176 F. App'x 187, 189 (2d Cir. 2006) (summary order). However, in that case, we explicitly noted that we did "not address whether … an inmate has a constitutional right not to become an informant." *Id.* Further, neither the Supreme Court nor any other circuit court has yet to decide whether a prisoner holds a right not to serve as an informant. Accordingly, we conclude that the defendants are entitled to qualified immunity.

---

[4] We acknowledge that defendants did not raise the defense of qualified immunity in the district court. Although we do not generally consider a claim raised for the first time on appeal, we can exercise our discretion to do so where, as here, "the argument presents a question of law and there is no need for additional fact-finding." *Sniado v. Bank Austria AG*, 378 F.3d 210, 213 (2d Cir. 2004).

## CONCLUSION

We hold that the First Amendment protects a prisoner's right not to serve as an informant, as well as the right to refuse to provide false information to prison officials. Nonetheless, due to the novel nature of the legal questions before us, we conclude that defendants are entitled to qualified immunity. Accordingly, we AFFIRM the judgment of the district court. Each side to bear its own costs.