# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 16, 2025

Lyle W. Cayce
Clerk

No. 24-50876

Garland Ballentine,

*Plaintiff—Appellant*,

*versus*

Sergeant Heather Broxton; Jay Hart, *in his individual capacity*; Grievance Department Vicki Cundiff,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:19-CV-459

---

Before Jones and Graves, *Circuit Judges*, and Rodriguez, *District Judge*.[*]

James E. Graves, Jr., *Circuit Judge*:

Garland Ballentine, a recent parolee, alleges that Texas prison officials violated his Fifth, First, and Fourteenth Amendment rights by requiring him to make self-incriminating statements to access a program that had the potential of ending his administrative segregation assignment. Because we

---

[*] United States District Judge for the Southern District of Texas, sitting by designation.

conclude that the officials are entitled to qualified immunity as to Ballentine's Fifth and First Amendment claims, and that if a liberty interest existed, Ballentine was afforded sufficient procedural due process through periodic classification reviews, we AFFIRM summary judgment in the officials' favor.

## I.

## A.

In 2009, Garland Ballentine was convicted of aggravated assault and sentenced to 25 years in Texas state prison. Shortly after Ballentine's incarceration began, officials determined that he was a ranking member of the Aryan Circle, a notorious prison gang. The Texas Department of Criminal Justice ("TDCJ") classifies the Aryan Circle as a designated security threat group. Because of that classification, Ballentine was assigned to administrative segregation, a form of solitary confinement, and remained there for sixteen years until being paroled in 2025.[1]

A prisoner placed in solitary confinement because of a security threat group classification may only return to the general prison population through completion of the TDCJ's Gang Renouncement and Disassociation program ("GRAD"). To be eligible for GRAD placement, an inmate must (1) "contact the Security Threat Group Officer [] at the unit level in writing and renounce his membership and affiliation" with the gang, and (2) undergo an "interview and investigat[ion]" regarding the prisoner's alleged disassociation.

---

[1] In May 2025, during the pendency of this appeal, Ballentine's counsel informed the court that Ballentine "has been released from prison under parole."

In 2018, Ballentine initiated the GRAD process by renouncing his Aryan Circle affiliation and applying to the program.  Ballentine directed his renunciation to Heather Broxton, the sergeant in charge of the unit where he was housed.

On February 25, 2019, Broxton and another officer escorted Ballentine to an interrogation room.  At least six officers interviewed Ballentine that day: Jay Hart, the head of the prison's management office; and outside law enforcement officers from at least two Texas city police departments, Texas state police, and the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives.  According to Broxton, the goal of the interview was to obtain information "about activity from another unit [Ballentine] was assigned to."

Ballentine was asked about "activities that occurred after he went into prison" and "activities separate from why [] Ballentine went to prison in the first place."  Ballentine "refused to answer questions about his prior criminal activities" that may have occurred after he entered prison.  The interrogators then claimed to have "evidence that could be used to potentially incriminate him"—specifically, "a wire or a recorded line and they knew that it was Ballentine" who was conversing with "a corrupt officer" through a "contraband phone."  Broxton surmised that the officers employed these tactics to encourage Ballentine to share "his side of the story" and provide "an answer" to their questions.  At some point, "after [Ballentine] refused to answer further questions, the interrogation concluded."  As Broxton escorted Ballentine back to his cell, she encouraged him to cooperate and "reach out to" her "if he decided he wanted to talk with" the officers again.

About a week after the interview, on March 6, Broxton sent Hart a writeup of the interrogation.  She summarized that Ballentine "was uncooperative in answering questions in regards to an investigation

conducted by Federal prosecutors involving members of the Aryan Circle." She accordingly recommended that Ballentine's "Disassociation Investigation be terminated." Ballentine alleges that Hart adopted Broxton's recommendation, and on June 11, Broxton provided Ballentine with written notice that his "disassociation investigation ha[d] been discontinued due to: Other: Failure to cooperate with outside law enforcement regarding Aryan Circle investigation." Notably, on the form that Broxton completed, she did not mark another printed reason for discontinuing Ballentine's investigation. The line next to the justification, "[i]t has been determined you are still active in your gang[,]" remained unchecked.

Ballentine filed two formal grievances relating to the interrogation. The first, filed in March 2019, complained of a "coercive atmosphere" and accused the officers of attempting "to elicit incriminating responses from [him]." He requested that TDCJ provide a copy of a document that he partially signed during the interview, as well as the names of those who interviewed him. This grievance was summarily denied; the only explanation given was that no security threat group staff members were among the interrogators.

Ballentine's second grievance was filed in June 2019, two days after receiving notice that his GRAD investigation had been terminated. In that grievance, he characterized the investigation as a sham, challenged its termination, and requested that the Department "close[] out" the investigation so that he could exhaust his administrative remedies and "file a 1983" action in federal court. Vicki Cundiff, the Grievance Department Chair, dismissed the grievance because the "grievable time period ha[d] expired" and because Ballentine's complaint was "redundant." She later admitted in a deposition that these justifications were improper.

**B.**

In August 2019, Ballentine sued Broxton, Hart, and Cundiff (the "defendants" or "TDCJ officials") under 42 U.S.C. § 1983, alleging that the termination of his GRAD application violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. He also sought leave to proceed *in forma pauperis*, and requested appointed counsel. On August 12, the district court granted Ballentine leave to proceed *in forma pauperis*, denied Ballentine's motion for appointed counsel, and directed Ballentine to provide a more definite statement of his claims. Ballentine provided a revised statement, and moved for reconsideration of his request for appointed counsel.

On December 13, and without ordering a response from the defendants, the district court *sua sponte* dismissed Ballentine's complaint, with prejudice, for failure to state a claim. Eight months later, in August 2021, a per curiam panel of this court vacated the district court's order, ordered the district court to serve the defendants, and remanded with instructions to "consider the arguments on both sides."

On remand, Ballentine again moved for appointed counsel. The district court summarily denied that motion, and again, Ballentine moved for reconsideration to no avail. The defendants answered and moved to dismiss Ballentine's complaint for failure to state a claim. Ballentine then filed motions to compel discovery, for leave to file an amended complaint, to supplement the record, and for summary judgment. On May 6, 2022, the district court issued an omnibus order denying Ballentine's requests, and entered summary judgment for the defendants. Ballentine again appealed, and his appellate counsel focused on three constitutional claims associated with the denial of his participation in the GRAD program. A different panel of this court concluded that the district court abused its discretion in denying Ballentine's renewed motion for appointed counsel, and remanded to the district court for further proceedings.

Ballentine returned to the district court, and with the assistance of his appellate counsel, amended his complaint to allege violations of his Fifth (self-incrimination), First (compelled speech and retaliation), and Fourteenth Amendment (procedural due process) rights. He sought damages and declaratory and injunctive relief for alleged constitutional violations related to his solitary confinement. In September 2024, and after discovery concluded, the district court again granted summary judgment for the defendants. It concluded that there was no factual dispute as to any of the alleged constitutional violations, and that in any event, the defendants were entitled to qualified immunity. Ballentine again timely appealed.

In late 2024, during the pendency of this appeal, Ballentine was added to TDCJ's "Serious and Violent Offender Reentry Initiative program," making him eligible for parole. In May 2025, Ballentine's counsel informed the court that Ballentine "has been released from prison under parole." Because of this recent development, Ballentine "no longer seeks declaratory or injunctive relief," but "maintains his claims for damages" related to his solitary confinement.

## II.

Grants of summary judgment are reviewed de novo. *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 215 (5th Cir. 2024) (citation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Once the moving party has demonstrated the absence of a material fact issue, the non-moving party must 'go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A dispute as to a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Id.* "When considering summary judgment evidence, [this court] must view 'all facts and inferences . . . in the light most favorable to the nonmoving party.'" *Id.* (quoting *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)).

The TDCJ officials have also asserted qualified immunity in response to Ballentine's damages claims. To overcome the defense, a plaintiff must make two showings. "First, he must show that he adequately alleged that his rights were violated." *Stevenson v. Toce*, 113 F.4th 494, 501 (5th Cir. 2024). "Second, he must show that, at the time his rights were violated, legal precedent clearly established the officials' actions as unlawful." *Id.* As relevant here, the Supreme Court has directed that courts not "define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Instead, precedent must speak to "the violative nature of [the] particular conduct" and "the specific context of the case." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasis omitted).

## III.

## A.

Ballentine first appeals summary judgment for his Fifth Amendment self-incrimination claim. He asserts that the TDCJ officials conditioned his pre-GRAD investigation—and thus, his only method of leaving solitary confinement—on an unconstitutional obligation to make self-incriminating statements about his criminal activities in prison.

Because of his recent release, Ballentine now only seeks damages for these alleged Fifth Amendment violations. However, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*,

7

457 U.S. 800, 818 (1982)).  To overcome qualified immunity, Ballentine must show (1) "that he adequately alleged that his rights were violated," and (2) "that, at the time his rights were violated, legal precedent clearly established the officials' actions as unlawful."  *Stevenson*, 113 F.4th at 501.

We need not address the first prong, because the second prong is dispositive.[2]  Ballentine alleges that violations of his Fifth Amendment right were "clearly established" at the time of the interrogation for two reasons.  First, he highlights that *Lefkowitz v. Cunningham* barred government officials from penalizing "assertion[s] of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony." 414 U.S. 70, 77 (1973).  Second, he explains that the opinions in *McKune v. Lile* indicate that "indefinite solitary confinement that is severe enough to implicate a liberty interest cannot be imposed as a penalty for an inmate's refusal to incriminate."

But reliance on *Lefkowitz* is insufficient.  As noted above, the Supreme Court has admonished courts to not "define clearly established law at a high level of generality." *Ashcroft*, 563 U.S. at 742.  While *Lefkowitz*'s holding is straightforward—a government generally "may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right"— that principle is far too broad to apply to the specific instance of Ballentine's interrogation.  Moreover, *Lefkowitz* concerned a completely different context: the dispute centered on whether a state could force public contractors to either waive their Fifth Amendment immunity or face

---

[2] Because we conclude that the TDCJ officials are entitled to qualified immunity, we do not address their alternative theories for affirming the district court's conclusion— that (1) Ballentine lacks a Fifth Amendment claim because no statements were used against him in a criminal proceeding, or (2) that Hart's status as the ultimate decisionmaker for the GRAD program overrides Broxton's deposition testimony or evidence suggesting that Ballentine's application was terminated for unconstitutional reasons.

cancellation of, and disqualification for, future contracts. *Lefkowitz*, 414 U.S. at 70–75.

Meanwhile, the lack of a majority opinion in *McKune*, at a minimum, suggests that the Fifth Amendment self-incrimination issue is not "beyond debate." *Ashcroft*, 563 U.S. at 741. The case does feature a more comparable setting: the dispute concerned a Kansas inmate who was ordered to participate in a sexual abuse treatment program. *McKune*, 536 U.S. at 29–30. As part of the program, participants were required to complete a "sexual history form" that required detailing all prior sexual activities, including incidents that amounted to uncharged criminal conduct. *Id.* at 30. The inmate alleged that completing the form amounted to unconstitutional self-incrimination because the information provided was neither privileged nor immune from potential prosecution. *Id.* at 31.

The case produced three opinions from a fractured Court. Justice O'Connor's solo concurrence is considered the Court's holding because it is "the position taken by those Members who concurred in the judgment on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted); *see, e.g.*, *Lacy v. Butts*, 922 F.3d 371, 377 (7th Cir. 2019) (describing the O'Connor concurrence as "the narrowest grounds accepted by the concurring justices"); *United States v. Antelope*, 395 F.3d 1128, 1133 (9th Cir. 2005) ("[W]e treat Justice O'Connor's opinion in *McKune* as controlling[.]") In her concurrence, Justice O'Connor acknowledged that "certain types of penalties are capable of coercing incriminating testimony," but concluded that the consequences the inmate faced if he refused to participate—a "reduction in incentive level," "a corresponding transfer from a medium-security to a maximum-security part of the prison," and restrictions on canteen visits and visitation privilege—were not "serious enough to compel him to be a witness against himself." *McKune*, 536 U.S. at 49–51 (O'Connor, J., concurring).

No. 24-50876

The concurrence also indicated that more severe penalties, such as "longer incarceration and execution . . . are far greater than those we have already held to constitute unconstitutional compulsion in the penalty cases." *Id.* at 52. Ballentine references this reasoning and asserts that an extended period of solitary confinement would also be unconstitutionally compulsive. But that analogy is not "clearly established" from the opinion: Ballentine did not face capital punishment or an extended sentence over his blanket refusal to answer the interrogators' questions. *Ashcroft*, 563 U.S. at 742. Simply stated, reasonable minds can differ as to whether the continuation of solitary confinement, without any additional penalties or consequences, constitutes "unconstitutional compulsion" that triggers Fifth Amendment protections. *McKune*, 536 U.S. at 52 (O'Connor, J., concurring).

Ballentine's assertion of a clearly established precedent is further muddied by two other aspects of his incarceration. First, in *Ohio Adult Parole Auth. v. Woodard*, the Supreme Court held that a voluntary clemency interview offered to a criminal defendant on death row did not violate the Fifth Amendment because the defendant "merely faces a choice quite similar to the sorts of choices that a criminal defendant must make in the course of criminal proceedings, none of which has ever been held to violate the Fifth Amendment." 523 U.S. 272, 286 (1998). That holding lends support to TDCJ's argument that the choice offered to Ballentine—inform officials on prison gang activity, or remain in administrative segregation—was not violative of the Fifth Amendment.

Second, as Justice O'Connor recognized in her concurrence, "[c]omplicating matters even further is the question of whether the denial of benefits and the imposition of burdens ought to be analyzed differently in this area." *McKune*, 536 U.S. at 53 (O'Connor, J., concurring). On one hand, as Ballentine asserts, the TDCJ officials imposed a burden for his silence by, at a minimum, delaying his eligibility for a program that had the potential of

ending his solitary confinement. *See Spevack v. Klein*, 385 U.S. 511, 515 (1967) (noting that in the self-incrimination context, a "penalty is not restricted to [a] fine or imprisonment"). On the other hand, as the TDCJ officials claim, the GRAD program offers a benefit that prisoners must earn—in other words, they have no automatic entitlement to qualifying for the program itself. Ballentine's predicament is not one that "indisputably involves burdens rather than benefits," and that vagary further diminishes any clarity that any prison official could glean from the opinion. *McKune*, 536 U.S. at 53–54 (O'Connor, J., concurring).

As to his Fifth Amendment claim, then, Ballentine has failed to identify "legal precedent clearly establish[ing] the officials' actions as unlawful." *Stevenson*, 113 F.4th at 501. The TDCJ officials are accordingly entitled to qualified immunity, and because Ballentine only pursues a damages remedy against them, summary judgment is proper.

## B.

Next, Ballentine appeals the summary judgment as to his First Amendment compelled speech claim. His articulation of this claim is similar to his Fifth Amendment argument: the TDCJ officials allegedly conditioned his pre-GRAD investigation, and in turn, his ability to leave solitary confinement, on his apparent need to make particular statements about his prison activities. When Ballentine refused to engage in that speech, the defendants allegedly retaliated by terminating his GRAD investigation. Again, however, the second step of qualified immunity—whether "legal precedent clearly established the officials' actions as unlawful"—bars Ballentine from recovering damages.[3] *Stevenson*, 113 F.4th at 501.

---

[3] Because we conclude that the TDCJ officials are entitled to qualified immunity, we do not address their alternative theories for affirming the district court's conclusion—

No. 24-50876

To start, Ballentine points to "[l]ongstanding Supreme Court precedent" that establishes protections: to "refrain from speaking," *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); against "involuntary affirmation," *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943); and against making "compelled statements of fact." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 797 (1988). Those cases are central to the First Amendment compelled speech canon, but none involve prisoners' rights—*Wooley* involved the placement of state mottos on license plates; *Barnette* featured a requirement for students to salute the American flag; and *Riley* concerned the solicitation of charitable donations. That is insufficient: for qualified immunity purposes, precedent must speak to "the specific context of the case." *Mullenix*, 577 U.S. at 12.

Ballentine's prison-specific cases are also insufficient to demonstrate clear precedent that the defendants could have knowingly violated. *Prison Legal News v. Livingston*, 683 F.3d 201, 213–14 (5th Cir. 2012), broadly states that prisoners retain constitutional rights that are not "inconsistent with [their] status as a prisoner" or "with the legitimate penological objectives of the corrections system." That generalized balancing inquiry gives no clarity on the "the violative nature of [the] *particular* conduct" allegedly engaged in by Broxton and Hart. *Mullenix*, 577 U.S. at 12 (emphasis original).

And *Burns v. Martuscello*, which concluded that "the First Amendment protects both a prisoner's right to not serve as an informant, and to refuse to provide false information to prison officials," is an out-of-circuit

---

that (1) prison officials deserve significant deference in the realm of penological operations, and that their operational expertise outweighs Ballentine's asserted constitutional rights, or (2) Hart's alternative explanations for terminating Ballentine's pre-GRAD investigation override the retaliatory action, intent to retaliate, and causation elements that Broxton's testimony furnished for Ballentine's First Amendment claim.

opinion. 890 F.3d 77, 81 (2d Cir. 2018). While it is possible that several out-of-circuit cases could create a "robust consensus of cases of persuasive authority" to satisfy the second prong of qualified immunity, Ballentine falls far short of that showing. *D.C. v. Wesby*, 583 U.S. 48, 63 (2018); *cf. McClendon v. City of Columbia*, 305 F.3d 314, 330 (5th Cir. 2002) (en banc) (declining to find a robust consensus despite six other circuits recognizing a particular doctrine). Thus, with regard to his First Amendment claim, Ballentine has failed to identify controlling "legal precedent clearly establish[ing] the officials' actions as unlawful." *Stevenson*, 113 F.4th at 501. The TDCJ officials are accordingly entitled to qualified immunity, and because Ballentine only pursues a damages remedy, summary judgment is proper.

## C.

Lastly, Ballentine appeals the summary judgment as to his Fourteenth Amendment procedural due process claim. He posits that his sixteen-year period of "indefinite solitary confinement restrict[ed] a liberty interest" and entitled him to basic procedural due process requirements. The claim has two elements: "first[,] a court must determine whether the plaintiff has a protected liberty or property interest[,] and then the court must determine whether the state has provided adequate procedures for the vindication of that interest." *Jordan v. Fisher*, 823 F.3d 805, 810 (5th Cir. 2016), *as revised* (June 27, 2016) (citing *Wilkinson v. Austin*, 545 U.S. 209, 213 (2005)). Assuming *in arguendo* that Ballentine has an established liberty interest, we conclude that TDCJ officials have provided adequate procedures to allow him to vindicate that right.

When a liberty interest is implicated, TDCJ officials must provide "the minimum requirements of procedural due process," including a "reasonable opportunity to challenge his assignment." *Green v. McKaskle*,

788 F.2d 1116, 1124–25 (5th Cir. 1986). Ballentine's claim here reaches a double-bind. Ballentine avers that "Cundiff's handling of [his] grievances denied him due process," and that he was accordingly deprived of a "reasonable 'opportunity to object' to his exclusion from the GRAD program." But Texas inmates "do[] not have a federally protected liberty interest in having these grievances resolved to [their] satisfaction." *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005).

Ballentine then asserts that his challenge is not to "the outcome of a grievance process, [but rather to] the lack of any process at all." But in a per curiam opinion issued just over three years ago, this court noted that TDCJ provided inmates, including those in administrative segregation, with periodic classification reviews. *Striz v. Collier*, No. 20-40878, 2022 WL 1421834, at *1 (5th Cir. May 5, 2022) (per curiam). We notably concluded that those reviews provided "the process that is due through advance notice of review hearings and an opportunity to speak and submit evidence at those hearings." *Id.*

Crucially, *Striz* concerned an inmate who, "after being identified as a member of the Aryan Brotherhood," was "confined in administrative segregation for over two decades"—a near-match for Ballentine and his predicament. *Id.* We thus find *Striz*'s holding and reasoning persuasive, and note that Ballentine has neither asserted nor established that these periodic reviews were not offered to him. Accordingly, TDCJ officials have afforded procedures that are consistent with "the minimum requirements of procedural due process," *McKaskle*, 788 F.2d at 1124–25, and summary judgment on Ballentine's Fourteenth Amendment claim was proper.

## V.

For the reasons discussed above, we AFFIRM the summary judgment in the defendants' favor.